[No. 45882-5-I. Division One. April 16, 2001.]

UNITED DEVELOPMENT CORPORATION, *Appellant*, v. THE CITY OF MILL CREEK, *Respondent*.

---

[25] *Hunsley*, 87 Wn.2d at 436; *see also Hegel*, 136 Wn.2d at 132.

[26] *Hegel*, 136 Wn.2d at 135.

*Larry J. Smith* and *Jeffrey A. Beaver* (of *Graham & Dunn*), for appellant.

*Stephanie E. Croll* (of *Keating, Bucklin & McCormack, Inc., P.S.*) and *Scott M. Missall* (of *Short, Cressman & Burgess, P.L.L.C.*), for respondent.

ELLINGTON, J. — The principal developer of Mill Creek challenges the City's imposition of mitigation fees and other conditions for a recent subdivision. We agree with the superior court that mitigation fees for impacts on traffic and public parks were justified, that the City is not required to quantify and account for the effect of private recreational facilities in determining public park impacts, and that the developer cannot be required to make improvements to a road drainage system because the subdivision will have no impact on drainage at that location. We therefore affirm the superior court in all respects.

## BACKGROUND

The development in question is known as Mill Creek 23. Because United Development Corporation (UDC) claims that several of the conditions for its approval are duplicative of requirements already imposed during the long process of developing Mill Creek, we briefly review the relevant history.

In 1974, UDC began to develop Mill Creek, a master

planned residential community of approximately 1,200 acres in Snohomish County. The development was governed by an agreement between UDC and the County, which specified a staged process for County approval of the development in segments consisting of sectors, divisions, and plats.

In 1981, UDC and Snohomish County entered into a road improvement agreement (1981 RIA), under which UDC would build six road projects for the County.

In 1983, the City of Mill Creek incorporated, encompassing all of the master planned development. The City assumed all the County's planning and approval responsibilities. The City formally adopted the 1974 contract and the 1981 RIA. The City also instituted its own zoning code and development regulations.

In 1985, the 1974 contract was formally amended to provide that future development approvals were subject to the city regulations then in effect:

> 2. The parties intend to replace the procedures, process and criteria for approval for sectors, division of development and plats set forth in the [1974] rezone contract with the relevant procedures, process and criteria set forth in city ordinance. To that extent the rezone contract is deemed amended as follows:
>
> . . . .
>
> C. The procedures and criteria for revisions to subdivision approvals and for new subdivision approvals shall be the same as set forth in relevant provisions of city ordinances relating to subdivision approval and as the same may hereafter be amended by the City.[1]

In 1986, UDC sought and obtained both an amendment to the agreement for a revision of the 1979 Sector 6 plan, and preliminary plat approval for development of Sector 6 as Mill Creek 16. The revisions to the Sector 6 plan involved an increase in the potential residential density. The Sector 6 rezone agreement again specifically provided that further development would be subject to "all rules, regulations,

---

[1] Amendment to Rezone Contract at 2, Admin. R., Ex. 52, Tab 3.

ordinances and policies of the City of Mill Creek."[2]

Mill Creek 16 contained seven tracts intended to be further subdivided. One of the seven tracts in Mill Creek 16 was Tract 298, which later became Mill Creek 23. Final approval of the Mill Creek 16 preliminary plat specified that Tract 298 was "subject to subsequent preliminary and final plat review and approvals."[3]

In 1994, the City adopted its current comprehensive plan. The parks and open space element of the plan established a level of service standard for neighborhood and community park facilities (two acres of neighborhood park and five to eight acres of community park for every 1,000 persons). In 1997, the City adopted a resolution establishing new traffic mitigation formulas and an ordinance establishing formulas for deriving park mitigation fees from the impacts of new development.[4]

In 1998, UDC sought preliminary plat approval for the development of Mill Creek 23. The subdivision adds 29 single family lots and approximately 84 new residents to the City. Pursuant to the State Environmental Policy Act[5] (SEPA) and the Mill Creek Municipal Code[6] (MCMC), the City approved Mill Creek 23, conditioned upon UDC's payment of $39,547 in traffic mitigation fees, $33,445 in neighborhood park impact fees, and $27,801.43 in community park impact fees. The City also required UDC to make storm water drainage improvements to the road adjacent to the subdivision.

UDC appealed these mitigation requirements to the Mill Creek Planning Commission. The Commission recommended that the City Council approve the development with the conditions. UDC appealed to the City Council,

---

[2] Concomitant Zoning Agreement for Sector 6 Rezone at 2, Admin. R., Ex. 52, Tab 5.

[3] Resp't/Cross-Appellant's Br., Attach. 10.

[4] Resolution 97-227; Resolution 97-236.

[5] Chapter 43.21C RCW.

[6] MILL CREEK MUNICIPAL CODE (MCMC) 17.48.

which upheld the requirements.

UDC filed a further appeal in superior court under the Land Use Petition Act[7] (LUPA). The superior court affirmed the park and traffic mitigation requirements. However, the court ruled the drainage improvements requirement not justified, finding:

> UDC was required to complete Mill Creek Boulevard in 1986; that any contractual obligation was fulfilled at the time the City accepted the road; that the only justification the City would have for requiring further improvements is if the development in question impacted the road and its drainage system. And here it clearly does not.[8]

Both parties appeal.

## DISCUSSION

### 1. LUPA Review

Under the Land Use Petition Act, relief from a land use decision may be granted if the petitioner can show, among other possible grounds, that "[t]he land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise."[9] Relief may also be granted if the petitioner can show that the "decision is not supported by evidence that is substantial when viewed in light of the whole record before the court."[10]

■■■ When reviewing an administrative decision, we stand in the same position as the superior court.[11] Review is grounded in the administrative record.[12] Factual findings are considered under the substantial evidence standard,

---

[7] Chapter 36.70C RCW.

[8] Report of Proceedings (Nov. 19, 1999) at 8-9.

[9] RCW 36.70C.130(1)(b).

[10] RCW 36.70C.130(1)(c).

[11] *Isla Verde Int'l Holdings, Inc. v. City of Camas*, 99 Wn. App. 127, 133, 990 P.2d 429 (1999), *review granted*, 141 Wn.2d 1011 (2000).

[12] *Snohomish County v. State*, 69 Wn. App. 655, 664, 850 P.2d 546 (1993).

and conclusions of law are reviewed de novo.[13] Substantial evidence exists when the evidence in the record is sufficient to persuade a fair-minded rational person of the truth of the finding.[14]

UDC seeks review under both the error of law standard and the substantial evidence standard. But because UDC assigns no error to the findings of the City Council, they are verities on appeal.[15] We therefore review for substantial evidence only where no findings address the issue.

2. Duplicative Mitigation Requirements

■ Projects with a significant development horizon may be conditioned as appropriate when the actual development occurs.[16] Consistent with the parties' explicit agreements and with express conditions upon previous approvals in the staged development process, the traffic and park mitigation requirements for Mill Creek 23 were imposed pursuant to the City's comprehensive plan and then-current development regulations.

UDC acknowledges that a developer may be required to mitigate the direct impacts of a development, and UDC does not challenge application of current regulations. But a developer may not be required to mitigate the same impact twice.[17] UDC claims that all traffic and park impacts for Mill Creek 23 were mitigated in earlier stages of the development process.

---

[13] *Biermann v. City of Spokane*, 90 Wn. App. 816, 821, 960 P.2d 434 (1998).

[14] *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 34, 891 P.2d 29 (1995).

[15] *Stuewe v. Dep't of Revenue*, 98 Wn. App. 947, 950, 991 P.2d 634, *review denied*, 141 Wn.2d 1015 (2000) (administrative finding of fact not assigned error is verity on appeal); *Hilltop*, 126 Wn.2d at 30.

[16] *See Eastlake Cmty. Council v. Roanoke Assocs.*, 82 Wn.2d 475, 513 P.2d 36 (1973) (SEPA evaluation may occur during any major stage of a single development project).

[17] RCW 82.02.050 provides, in part: "(1) It is the intent of the legislature: . . . (c) To ensure that impact fees are imposed through established procedures and criteria so that specific developments do not pay arbitrary fees or duplicative fees for the same impact."

a. Road and Traffic Impact Assessment

According to the City Council's findings,[18] which UDC does not challenge, "[Mill Creek 23] is expected to generate an estimated 278 new daily vehicle trips [which] will impact intersections and road segments throughout Mill Creek."[19] To this figure, the City applied its trip mitigation formula and assessed $38,553. Vehicle trips had not previously been the subject of a mitigation requirement, and UDC does not contend the formula was improperly calculated. Rather, UDC claims that at two points in the earlier stages of the development process, all traffic impacts for Mill Creek 23 were mitigated.

First, UDC relies upon language in the 1981 RIA describing its purpose: "[T]o fix and determine the entire *fair share of UDC for improvements to affected road systems* as a result of the Mill Creek project, and in particular the development of *Sector 8* in the Mill Creek Community[.]"[20] UDC claims that its "entire fair share" of road improvements for the entire Mill Creek development was assessed by this agreement.

We reject this argument. The "affected road systems" addressed in the RIA were defined in the agreement, and consisted of portions of Mill Creek Road, Seattle Hill Road, and 23rd Avenue. Traffic mitigation fees for Mill Creek 23 were imposed for impacts on nine roads. Of those, only Seattle Hill Road was also considered in the 1981 RIA. The RIA required improvements only to the "[p]ortion of Seattle Hill Road within Sector 8 from north boundary to south boundary of sector 8."[21] Mill Creek 23 is in Sector 6, not

---

[18] The City Council adopted the findings of the City Planning Commission, which in turn incorporated certain findings from the staff report to the Planning Commission regarding Mill Creek 23. *See* City Council Resolution 99-265 at 7, Admin. R., Ex. 68; Planning Commission Resolution 99-79 at 2, Admin. R., Ex. 68. None of the findings expressly addresses whether the traffic mitigation requirements for Mill Creek 23 were duplicative of earlier mitigation.

[19] Staff Report to the City of Mill Creek Planning Commission at 9, Admin. R., Ex. 68 (as adopted by City Council Resolution 99-265).

[20] Road Improvement Agreement at 9, Admin. R., Ex. 52, Tab 1 (emphasis added).

[21] Road Improvement Agreement at 4, Admin. R., Ex. 52, Tab 1.

Sector 8. In addition, the 1981 RIA addressed road improvements, while Mill Creek 23 mitigation was assessed pursuant to the 1997 comprehensive plan and Resolution 97-227 establishing traffic mitigation formulas for vehicle trips. The Mill Creek 23 traffic mitigation clearly does not duplicate the RIA.

Second, UDC contends that road improvements required for the 1986 Sector 6 rezone and the preliminary plat approval of Mill Creek 16 satisfied any mitigation for traffic impacts for Mill Creek 23, because the number of total residences to be authorized in Mill Creek 23 was then known, and all traffic impacts must have been fully considered.

█ There are several problems with this argument. Approval of Mill Creek 16 was conditioned upon construction of the section of Mill Creek Boulevard running through Mill Creek 16 and installation of a traffic signal at its intersection with State Route 527. UDC does not explain how construction of part of Mill Creek Boulevard and installation of a traffic signal could mitigate all traffic impacts for all of Sector 6/Mill Creek 16—much less for the individual subdivisions (such as Mill Creek 23), for which approval was to be sought years later. In addition, the restrictions on final approval of Mill Creek 16, which were not appealed, clearly mandated that resubmission for formal plat approval was required for further subdivision; development of Tract 298 (Mill Creek 23) was explicitly "subject to subsequent preliminary and final plat review and approvals."[22]

Finally, UDC relies upon a 1989 city staff report to the Planning Commission regarding the approval of Mill Creek 18 (another subdivision in Sector 6/Mill Creek 16). The report stated, "Transportation impacts for this project were mitigated previously with the approval of the plat of Mill Creek 16."[23] From this language, UDC argues that all

[22] Resp't/Cross-Appellant's Br., Attach. 10.

[23] Staff Report to Planning Comm'n at 7, Admin. R., Ex. 52, Tab 7 (as adopted

traffic impacts for all subdivisions in Sector 6/Mill Creek 16 "had already been assessed and collected when Mill Creek 16 was approved."[24] But UDC ignores the phrase "for this project," which clearly referred to Mill Creek 18, and also ignores the changes in the regulatory framework between 1989 and 1998.

UDC's arguments that traffic impact fees for Mill Creek 23 were duplicative of previous mitigation are without merit.

b. Public Park Impact Assessment

The City evaluated its public park needs, and established service standards in the parks and open space element of its comprehensive plan, adopted under RCW 36.70A.080. UDC concedes the City's level of service standard is "a nation-wide benchmark commonly used by most jurisdictions in western Washington as the starting point for assessing the impact of subdivisions on public parks."[25] The City has adopted a formula by which public park impacts are assessed according to the per person cost of creating the necessary facilities, which is applied to the projected population increase attributable to the development. The city code requires that development approvals be conditioned upon mitigation of such impacts.[26]

The 1989 staff report on Mill Creek 18 also stated, "Recreation impacts have been mitigated by previous land and monetary contributions[.]"[27] Based on this language, UDC makes the same argument it made for traffic impacts. But again, the staff report referred to a different project, mitigation for which cannot be said to be mitigation of the population-based impacts of Mill Creek 23.

UDC also contends that the public park impact of Mill

---

by City Council Resolution 89-99).

[24] Appellant's Br. at 17.

[25] Appellant's Br. at 24.

[26] See MCMC 17.48.070(A), (C).

[27] Staff Report to Planning Comm'n at 7, Admin. R., Ex. 52, Tab 7 (as adopted by City Council Resolution 89-99).

Creek 23 was mitigated when UDC dedicated 2.27 acres of land to the City in 1987 as a condition of approval of Mill Creek 16. This land eventually came to be Library Park. UDC argues the Library Park dedication constitutes all the mitigation that can lawfully be required for public park impacts in all subdivisions in Sector 6/Mill Creek 16, including Mill Creek 23. The City Council found, however, that Library Park "was not required as mitigation for impacts to the City's park and recreation system or as mitigation for future impacts arising from subsequent property development; thus, [it] cannot be used to offset UDC's current obligation to comply with state and local laws."[28] This finding is unchallenged, and therefore is a verity on appeal.[29]

Public park mitigation assessed for Mill Creek 23 was not duplicative.

c. Changed Circumstances

In a related argument, UDC asserts that "[t]he City may not assess additional mitigation at subsequent phases of development review merely because of changed circumstances."[30] UDC's argument depends upon the premise that all impacts were mitigated at early stages, and cannot be recalculated later under more stringent regulations. As just discussed, all impacts were not mitigated at earlier stages. As noted above, the parties agreed to a staged process subject to then-existing requirements. This expectation was also included as a restriction in the final approval of Mill Creek 16 (which was the preliminary plat of Sector 6), and explicitly applied to Tract 298 (which eventually became Mill Creek 23). No appeal was taken from those conditions. Where there has been no duplication, UDC cannot now complain of the application of current regulations in assessing mitigation.

---

[28] Resolution 99-265 at 5, Admin. R., Ex. 68.

[29] *Hilltop*, 126 Wn.2d at 30.

[30] Appellant's Br. at 39.

#### d. Private Parks, Public Parks

 Even if the mitigation is not duplicative, however, UDC asserts that at least as to parks, the assessment does not accurately reflect the impact of the development. UDC claims that because residents of Mill Creek 23 are members of the Mill Creek homeowners' association (MCCA), the City was required to consider the effect of the private recreational facilities inside MCCA when it measured the impact of the development on public parks.[31]

UDC challenges neither the level of service standard nor the conversion formula, per se. Instead, UDC contends the availability of private recreational facilities for exclusive use of MCCA members reduces the likelihood they will use public parks. UDC argues that because only the direct impact of the development may be subject to mitigation, the private facilities must somehow be taken into account: "[T]he City should have calculated a demand standard that fits the circumstances of this Subdivision, rather than utilizing its customary . . . benchmark."[32]

UDC does not say how this calculation should be accomplished, except to complain that the City "failed to undertake site specific analyses and, instead, simply has applied a mechanical formula."[33] UDC acknowledges, however, that under *Trimen Development Co. v. King County*,[34] the City is not required to conduct a site-specific analysis of direct impacts.

In *Trimen*, the County utilized a population derivative to determine the impact a proposed development would have on open space and public parks. The calculation was formulated from a comprehensive assessment of county open space and park needs, which indicated a deficit of park acreage based upon adopted County standards. The devel-

---

[31] The private facilities in MCCA include a golf course, a swim club, a tennis club, a nature preserve, urban trails, and a playfield. UDC and MCCA have apparently denied the City's request to program the facilities for public use.

[32] Appellant's Br. at 36.

[33] Appellant's Br. at 19.

[34] 124 Wn.2d 261, 877 P.2d 187 (1994).

oper challenged both the power of the County to require a mitigating dedication, and the formulation of the fees in lieu of dedication. Ruling that King County's impact formulation and mitigation requirements were within the mandate of state law, the Supreme Court held that it was within the discretion of the County to use such a standardized methodology: "The County's method of calculating . . . the fees to be paid in lieu of dedication, was a reasonable, pro-active approach to the regulation of development . . . as authorized by RCW 82.02.020."[35]

The formula employed by King County and approved in *Trimen* is similar to the formula utilized by Mill Creek in evaluating the potential parks impacts of Mill Creek 23. Both rely on population as the key variable. Like King County, Mill Creek conducted a comprehensive evaluation of its parks needs before adopting the parks element of its comprehensive plan. Mill Creek then applied a population-based formula to determine the additional impact on public parks represented by Mill Creek 23. This is a rational means of determining the direct impact of a development.

The City is granted some discretion in developing its impact formulations under RCW 82.02.020. The City Council found that private facilities did not and could not satisfy the public park service levels required by the comprehensive plan: "The council specifically finds that private facilities . . . previously dedicated by UDC to MCCA are privately owned and operated and are not public; therefore, [they] do not meet the criteria of or serve as a public community park as defined within the Comprehensive Plan[.]"[36] This finding is unchallenged on appeal.

UDC, however, argues that the City must somehow determine the direct impacts of each subdivision, and that the existence of private facilities affects the probable impacts of the development on public parks. UDC relies

---

[35] *Trimen*, 124 Wn.2d at 275.

[36] Resolution 99-265 at 5, Admin. R., Ex. 68.

heavily on *Vintage Construction Co. v. City of Bothell*.[37] In *Vintage*, this court, relying upon *Henderson Homes, Inc. v. City of Bothell*,[38] rejected Bothell's methodology for conditioning approval of a proposed subdivision upon the developer's payment of a $400-per-lot fee for public parks, because the fee was not derived specifically from the value of the land the developer could have been required to dedicate to the City for park usage under RCW 82.02.020.[39] We held that a fee in lieu of a dedication must be based upon the value of the land the developer could be required to dedicate, and be reasonably necessary as a direct result of the specific project.[40] Here, however, value of land is not the question, and no site-specific determination is required.[41]

UDC also attempts to draw inferences from *Vintage* because of its facts. Vintage Homes was a development designed to attract homeowners who wished to keep and ride horses, and equestrian amenities were provided within the development. The Bothell Parks Board and City Council had agreed to recognize the development's horse trails as a partial substitute for neighborhood park facilities, but then had failed to account for them in the calculation of the fee in lieu of dedication: "[P]resumably [the horse trails] reduced the amount of land Bothell could require Vintage to dedicate for parks. Yet, because it was relying on a generalized formula, the City did not consider whether, or to what extent, the trails would alter the amount of the fee."[42]

Again, UDC's reliance on *Vintage* is misplaced. The development's horse trails were relevant to determining the proper calculation of the fee only because the city had

[37] 83 Wn. App. 605, 922 P.2d 828 (1996), *aff'd*, 135 Wn.2d 833 (1998) (adopting this court's opinion).

[38] 124 Wn.2d 240, 877 P.2d 176 (1994).

[39] *Vintage*, 83 Wn. App. at 612.

[40] *Vintage*, 83 Wn. App. at 610.

[41] *See Trimen*, 124 Wn.2d at 275.

[42] *Vintage*, 83 Wn. App. at 611.

exercised its discretion to recognize the horse trails as a partial substitute for public park facilities.[43] Nowhere in its opinion did the court imply that a city is required to consider private facilities in the calculation of a development's impact on local public park needs. *Vintage* involved a fee in lieu of dedication, which requires a site-specific determination: "The problem with Bothell's present analysis is that it still does not establish a site-specific relationship between the amount of the fee and the value of 'the land that would have been dedicated.' "[44] The impact fee for Mill Creek 23 is not a fee in lieu of dedication, and does not require a determination beyond the analysis approved in *Trimen*.[45]

UDC's assertion that the residents of Mill Creek 23 will make less use of public parks has superficial appeal, but it is largely speculation, especially in the long term, and UDC presented no evidence supporting its assertion. We are unwilling to assume, for example, that golfers who pay dues to the Mill Creek golf club are different from other golfers in their use of parks; many golfers probably pay dues somewhere, but there is no reason to assume a resulting impact on neighborhood and community parks. It also seems likely that despite the private facilities of MCCA, residents of Mill Creek 23 will play organized soccer or softball in city parks. In addition, the nature and condition of private facilities would greatly affect their rate of use. As the City points out, it has no control over the facilities inside the gates of the development. Those facilities may change or even disappear. Since their future character—except, perhaps, as required open space, which has been credited already—is uncertain, we see no reason the City must assume their character will remain unchanged when assessing the long-term impact of the development on public parks.

---

[43] It is not apparent from the court's opinion whether the horse trails were open to the public.

[44] *Vintage*, 83 Wn. App. at 610-11 (quoting *Trimen*, 124 Wn.2d at 275) (emphasis omitted).

[45] *See Trimen*, 124 Wn.2d at 275.

In effect, UDC asks us to disallow the use of standards and formulas. We reject this contention. Taken to its logical conclusion, UDC's argument would require a municipality to make a study of every proposed development offering amenities to determine whether those entirely private facilities—whether backyard swimming pools or sport courts, community pools, tennis courts or golf courses, or riding arenas, or an airstrip, or any of the innumerable possibilities and combinations—would cause the development (at least when new) to have a measurably smaller effect on the use of public parks than is anticipated by the formula. As recognized in *Trimen*, the law does not require such an analysis.[46]

A city is entitled to set a minimum level of *public* parks facilities for all its citizens. Mill Creek's comprehensive plan contains its unchallenged assessment of public park needs, and UDC does not challenge the fee-conversion formula as a sensible means for assessing impact mitigation requirements generally. The City Council had discretion under the statute to determine whether the need for public recreational facilities for the residents could in any way be satisfied or mitigated by UDC's private facilities. The Council found the public need could not be satisfied by private facilities, and that finding is unchallenged here. The Council also refused to alter its mitigation formula for public parks because of the private facilities, and nothing in RCW 82.02.020 prohibits the City's approach, which, like King County's in *Trimen*, is "a reasonable, proactive approach to the regulation of development."[47]

3. Constitutional Issues

 UDC makes two arguments challenging the constitutionality of Mill Creek's imposition of impact fees. First, UDC contends that the mitigation requirements for parks and traffic are not "roughly proportional" to the subdivision's impact and therefore constitute an impermissible

[46] *See Trimen*, 124 Wn.2d at 275.

[47] *Trimen*, 124 Wn.2d at 275.

taking.[48] Our discussion above resolves this issue. Only if the mitigation for Mill Creek 23 duplicated earlier mitigation for parks and traffic could it be said that the trip formula or the parks level of service formula is not roughly proportional to the impact of the subdivision. Because there was no duplication, there was no taking.

■ Second, UDC contends that Mill Creek's mitigation requirements violate due process. This is a reasonableness question.[49] In determining whether a regulation violates due process, we ask whether the regulation is aimed at achieving a legitimate public purpose, whether it uses means that are reasonably necessary to achieve that purpose, and whether it is unduly oppressive on the landowner.[50]

As discussed above, both case law and statute allow the imposition of impact mitigation fees as reasonable conditions for development approval. The traffic and parks mitigation requirements for Mill Creek 23 have a legitimate public purpose, and the means used were reasonably necessary to its achievement. UDC makes no argument the fee is unduly oppressive. There was thus no violation of UDC's substantive due process rights.

4. Drainage Improvements along Mill Creek Boulevard

■ The City cross appeals, challenging the superior court's decision that UDC cannot be required to make frontage improvements for drainage along Mill Creek Boulevard. As previously discussed, mitigation requirements may be imposed where there is a reasonable and direct relationship between the effects of the proposed development and the required mitigation.[51] The superior court held, and we agree, that the record does not support

---

[48] See *Benchmark Land Co. v. City of Battle Ground*, 103 Wn. App. 721, 727, 14 P.3d 172 (2000); *Sparks v. Douglas County*, 127 Wn.2d 901, 915, 904 P.2d 738 (1995).

[49] *Guimont v. Clarke*, 121 Wn.2d 586, 608, 854 P.2d 1 (1993).

[50] *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 330, 787 P.2d 907 (1990).

[51] RCW 82.02.020; *Sparks*, 127 Wn.2d at 915.

the existence of such a relationship. Indeed, it is undisputed that Mill Creek 23 will have no effect upon drainage at the adjacent boulevard.

■ The City defends the improvements condition by arguing that the need to bring the adjacent street "up to code" justifies the requirement.[52] This is apparently an extension of the argument that current codes control mitigation assessments. But that is true only where the development itself has an impact to be mitigated. The City has demonstrated no impact at all.

Instead, the City argues that the drainage improvements are a good idea, and therefore can be required as a condition of UDC's subdivision even though the need for the improvements is not directly related to development of the subdivision. This is not the law, either under the Mill Creek code or the statute.[53] The superior court correctly reversed this requirement.

The judgment of the superior court is affirmed. Respondent's motion for attorney fees is granted with respect to fees incurred responding to UDC's appeal (fees are not awarded on the cross appeal). Respondents are directed to comply with RAP 18.1.

BAKER and APPELWICK, JJ., concur.

Review denied at 145 Wn.2d 1002 (2001).

---

[52] Resp't/Cross Appellant's Br. at 47.

[53] *See* RCW 82.02.020; MCMC 17.48.020(C) ("Proportional mitigation should be required from each property developer for the impacts attributable to his development . . . .").