[No. 52914-5-I.   Division One.   August 2, 2004.]

THE CITY OF MEDINA, *Appellant*, v. T-MOBILE USA, INC., ET AL., *Respondents*.

20

*Kirk R. Wines*, for appellant.

*Paul J. Lawrence* and *Sally A.B. Brick* (of *Preston Gates & Ellis, L.L.P.*), for respondents.

AGID, J. — The city of Medina appeals a superior court decision rejecting its appeal from a hearing examiner's decision granting T-Mobile USA, Inc.'s request for a special use permit (SUP) and three variances to construct a wireless communication facility (WCF) in Medina. It argues the trial court erred because the hearing examiner (1) improperly considered service issues when granting the variance, (2) did not apply the variance criteria set forth in the Medina Municipal Code (MMC) for each variance, (3) improperly placed the burden of proof on the city of Medina to show the WCF would cause material detriment to the public welfare and nearby property owners, and (4) erred by granting the SUP. We affirm because Medina's own code requires the hearing examiner to consider service issues, and the examiner neither erred in allocating the burden of proof nor in concluding that T-Mobile satisfied the code criteria for each variance and the SUP.

## FACTS

On January 22, 2002, T-Mobile USA, Inc., submitted an SUP/variance application to construct a WCF in the city of Medina (City). T-Mobile stated that the proposed WCF would provide effective cell phone coverage and new 911 services to the northern part of Medina.[1] It requested three variances from the requirements of chapter 17.90 MMC, the Wireless Communications Facilities Code, to (1) locate the WCF support equipment aboveground where the zoning required that the equipment be located underground or within a building, (2) allow a 55-foot tall WCF antenna when the zoning limited height to 35 feet, and (3) reduce the

---

[1] In 1996, the Federal Communications Commission (FCC) mandated that all wireless providers develop advanced 911 services to ensure wireless phone users can reach 911.

property setback for WCFs from 500 feet to 80 feet. It also requested an SUP because it planned to construct the WCF within the SR-520 right-of-way adjacent to a single-family residential zone.[2] On September 17, 2002, a Medina hearing examiner held a hearing on T-Mobile's application. It granted the SUP and variances on October 24, 2002, and denied the City's request for reconsideration on December 20, 2002. The City filed an appeal in superior court under the Land Use Petition Act (LUPA).[3] The superior court affirmed the hearing examiner's findings, conclusions, and decision. The City appeals.

## ANALYSIS

Under LUPA, a court may reverse a land use decision if one of the statutory criteria is met. It provides in relevant part:

(1) The superior court, acting without a jury, shall review the record and such supplemental evidence as is permitted under RCW 36.70C.120. The court may grant relief only if the party seeking relief has carried the burden of establishing that one of the standards set forth in (a) through (f) of this subsection has been met. The standards are:

. . . .

(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;

(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;

---

[2] The SR-520 property is owned by the Washington State Department of Transportation (WSDOT) and not zoned. The hearing examiner found the zoning designation is not at issue because chapter 17.90 MMC applies to "all land within the city . . . including . . . state-owned rights-of-way." MMC 17.90.170(B). The city council acknowledges in the MMC that it is not clear to what extent local zoning regulations can govern facilities on state land, but "encourage[s] WSDOT to require compliance with local zoning regulations" governing WCFs. MMC 17.90.050, Policy 13, *City Attorney and Staff Comments*.

[3] Ch. 36.70C RCW.

(d) The land use decision is a clearly erroneous application of the law to the facts.[4]

On appeal of an administrative decision, we review the record before the hearing examiner, including findings of fact and conclusions of law.[5] RCW 36.70C.130(1) "reflects a clear legislative intention that this court give substantial deference to both legal and factual determinations of local jurisdictions with expertise in land use regulation."[6] Whether a land use decision is an erroneous application of the law is a legal question we review de novo.[7] A decision is clearly erroneous only when the court is left with the definite and firm conviction that a mistake has been made.[8] We view the evidence and any reasonable inferences in the light most favorable to the party that prevailed in the highest forum exercising fact-finding authority.[9] Substantial evidence is evidence of a sufficient quantity to persuade a fair-minded person of the truth or correctness of the order.[10] We use these standards to address each issue the City has raised.

## I. Cellular Service Issues

The City argues that a hearing examiner cannot grant a variance when the applicant justifies its request based upon

---

[4] RCW 36.70C.130.

[5] *N. Pac. Union Conference Ass'n of Seventh Day Adventists v. Clark County*, 118 Wn. App. 22, 28, 74 P.3d 140 (2003).

[6] *Timberlake Christian Fellowship v. King County*, 114 Wn. App. 174, 180, 61 P.3d 332 (2002), *review denied sub nom. Citizens for a Responsible Rural Area Dev. v. King County*, 149 Wn.2d 1013 (2003).

[7] *Id.* (citing *United Dev. Corp. v. City of Mill Creek*, 106 Wn. App. 681, 687, 26 P.3d 943, *review denied*, 145 Wn.2d 1002 (2001)).

[8] *Boehm v. City of Vancouver*, 111 Wn. App. 711, 716, 47 P.3d 137 (2002).

[9] *Davidson v. Kitsap County*, 86 Wn. App. 673, 680, 937 P.2d 1309 (1997).

[10] *Benchmark Land Co. v. City of Battleground*, 146 Wn.2d 685, 694, 49 P.3d 860 (2002).

its desire to provide cellular coverage.[11] T-Mobile responds that chapter 17.90 MMC requires the hearing examiner to consider service issues.[12] T-Mobile is correct for two reasons.

■ First, both the MMC and the Federal Telecommunications Act of 1996 (FTA), 47 U.S.C. §§ 151-614, expressly and implicitly allow decision makers to consider service needs when making permit decisions. Under the MMC, a hearing examiner is authorized to make variance decisions "in harmony with the general purpose and intent of said zoning ordinances and such variances may vary any rules . . . of the zoning ordinances relating to the use of land and/or structures so that the spirit of the ordinances will be observed."[13] Chapter 17.90 MMC expressly states that one of its purposes is to establish "appropriate locations, site development standards, and permit requirements to allow for wireless communications services to the residents of the city [Medina], in a manner which will facilitate the location of various types of wireless communications facilities in permitted locations so they are consistent with the residential character of the city."[14] In addition, the chapter is "intended to allow wireless communications facilities *which are sufficient to allow adequate service to citizens, the traveling public and others within the city* and to accommodate the need for connection of such services to wireless

---

[11] The City cites *Sprint Spectrum L.P. v. Willoth*, 996 F. Supp. 253 (W.D.N.Y. 1998) (upholding a city's decision to deny a variance and stating that a carrier cannot unilaterally dictate the level of service it wishes to provide, nor does it have the right to construct any and all towers it deems necessary because that would nullify a local government's right to deny construction of WCFs), *aff'd*, 176 F.3d 630 (2d Cir. 1999); *Omnipoint Communications, Inc. v. City of Scranton*, 36 F. Supp. 2d 222, 233 (M.D. Pa. 1999) (rejecting an argument that mere gaps in service necessarily tipped the scales in favor of allowing a variance because if that were the case, local boards would have to approve virtually every application).

[12] This chapter was passed after a two-year moratorium on placing WCFs in Medina and was created, in part, in response to the Federal Telecommunications Act of 1996, 47 U.S.C. §§ 151-614.

[13] Former MMC 2.78.075 (2001).

[14] MMC 17.90.010.

facilities in adjacent and surrounding communities."[15] Given both of these MMC objectives, a hearing examiner may consider not only the adequacy of wireless service, but indeed *must* consider coverage and weigh it against the competing interests of aesthetics, retaining neighborhood character, and preserving property values. This becomes particularly important when determining whether a variance from the chapter 17.90 MMC siting requirements is "necessary." It would prove difficult, if not impossible, for a hearing examiner to determine whether a variance is necessary without first considering the adequacy of the service with and without the variance. In this case, the hearing examiner properly considered whether, in light of the site characteristics and surrounding property, the variances were necessary to further the competing purposes— service coverage and aesthetics—of chapter 17.90 MMC.

■ In addition, considering coverage is not barred by the FTA. The FTA specifically preserves local zoning authority with several limitations—one of which is that

> [t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
>
> . . . .
>
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.[16]

Courts interpreting the FTA have determined that the FTA does not prevent local officials from considering the quality of existing service. In *Cellular Telephone Co. v. Zoning Board of Adjustment of the Borough of Ho-Ho-Kus*,[17] the court stated,

---

[15] *Id.* (emphasis added). The mandate for considering adequate service is further indicated by MMC 17.90.050, Policy 8, which requires that applicants demonstrate a need for local services and provide coverage studies indicating the proposed WCF will provide local wireless services.

[16] 47 U.S.C. § 332(c)(7)(B)(i).

[17] 197 F.3d 64 (3d Cir. 1999).

> [W]e conclude that barring all local quality-of-service consider-
> ations could just as easily undermine the [FTA's] goals as
> further them. Decisions to grant or deny variances from local
> zoning ordinances generally require local officials to balance
> the interests that will be affected by the decision. . . . Obvi-
> ously, one of the interests affected by a decision to grant or deny
> a variance necessary to construct a wireless communications
> facility is the quality of existing wireless services. A finding
> that existing service is relatively poor could tip the scale in
> favor of granting a variance that, absent consideration of
> current quality, might otherwise be denied.[18]

This reasoning is logical and sound, and we adopt it.

Second, the cases the City cites in support of its argument
that T-Mobile cannot justify its variance requests with its
desire to provide adequate coverage are distinguishable.
Each of those cases involves analyzing whether a land use
authority improperly *refused* to grant a variance in viola-
tion of the FTA. While these cases hold that local zoning
authorities are not required by the FTA to grant variances
unless denying the application would effectively constitute
a ban on wireless services,[19] they do not prohibit a zoning
board from considering desired coverage for its citizens.[20]
Those cases reinforce the FTA's purpose of preserving local

---

[18] *Id.* at 69-70. The *Ho-Ho-Kus* court makes very clear, however, that while the
FTA does not divest local officials of the authority to consider service issues, it does
not create that authority. Rather, it must be "authorized by and performed within
the parameters of governing state and local law," such as the MMC in this case. *Id.*
at 70. But the court goes on to say that local authorities must ensure that their
decision does not effectively prohibit service or "result in 'significant gaps' in the
availability of wireless services." The court did not reach the question of what
constitutes a "significant gap." *Id.*

[19] *Willoth*, 996 F. Supp. at 257-58 (local authorities violate the FTA by banning
cell phone service only if the proposed WCF was the least intrusive means for
closing a significant gap in coverage); *Omnipoint*, 36 F. Supp. 2d at 233 (a carrier
is not entitled to install antennas in violation of existing zoning merely to fill a gap
in coverage); *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818 (7th
Cir. 2003) (denying a permit when a provider did not investigate alternative sites
does not prohibit wireless services).

[20] *See Ho-Ho-Kus*, 197 F.3d at 69-70.

zoning authority within the statutory limits.[21] Accordingly, when a cellular company bases its variance requests in part on coverage, as in this case, the local zoning authority is free to consider those issues according to local law. This conclusion is evident in the cases the City itself relies on where land use authorities considered service issues. For example in *Sprint Spectrum L.P. v. Willoth*,[22] the Town of Ontario Planning Board denied Sprint's application to build three cell towers. In reaching its decision, it considered service levels provided by Sprint's three-tower plan and weighed them against "adequate" service levels provided by a one-tower or two-tower plan.[23] In *Ho-Ho-Kus*, the hearing board considered testimony about whether the current levels of service were adequate under the FTA when considering a conditional use variance.[24] And finally, in *Omnipoint Communications, Inc. v. City of Scranton*,[25] the court upheld a zoning board's decision to reject a variance request based in part on Omnipoint's failure to respond to evidence that alternative sites could remedy a coverage gap.[26]

In this case, the hearing examiner applied Medina's local code which, as stated above, explicitly requires him to consider both service and aesthetic concerns when making decisions involving WCFs. Accordingly, he did not erroneously consider cellular service issues.

---

[21] *Id.* (The FTA does not abrogate local zoning authority in favor of a commercial desire to offer optimal service to customers.); *AT&T Wireless Servs. of Fla., Inc. v. Orange County*, 23 F. Supp. 2d 1355, 1358-59 (M.D. Fla. 1998) (The FTA does not preempt local authority and control over placement of WCFs.).

[22] 996 F. Supp. 253 (W.D.N.Y. 1998).

[23] *Id.*

[24] 197 F.3d at 74.

[25] 36 F. Supp. 2d 222 (M.D. Pa. 1999).

[26] *Id.* at 230.

## II. Variances

Chapter 17.90 MMC requires that WCFs be limited to a height of 35 feet[27] and located not less than 500 feet from the nearest residentially-developed properties.[28] In this case, T-Mobile asked for a variance permitting a 55-foot-tall WCF and a setback of 80 feet.

██ ██ The MMC requires that

[t]he hearing examiner shall not vary any of the rules, regulations, or provisions of the zoning ordinances unless it finds, after public hearing, that all of the following conditions exist in each case of an application for variance:

A. That the variance shall not constitute a grant of special privilege inconsistent with the limitation upon uses of other properties in the vicinity and zone in which the property on behalf of which the application was filed and located;

B. That such variance is necessary, because of special circumstances relating to the size, shape, topography, location or surroundings of the subject property, to provide it with the use rights and privileges permitted to other properties in the vicinity and in the zone in which the subject property is located;

C. That the granting of such variance will not be materially detrimental to the public welfare or injurious to the property or improvement in the vicinity and zone in which the subject property is situated.[29]

The City does not appear to challenge any of the hearing examiner's findings in this case, so they are verities on appeal. We conclude the hearing examiner correctly applied the variance criteria and his decisions are supported by substantial evidence in the record. Accordingly, his decisions are not clearly erroneous.

---

[27] MMC 17.90.040. This height restriction is similar to other height restrictions in the City of Medina. For example, the maximum height in R-20 and R-30 zones is from 30 to 36 feet under MMC 17.24.010 and 17.28.010; churches and schools are limited to 35 feet under 17.52.020 and .010; and electric power and utility substations are limited to 25 feet under MMC 17.52.030.

[28] MMC 17.90.030; MMC 17.90.050, Policy 10.1; MMC 17.90.060.

[29] Former MMC 2.78.075 (2001).

The hearing examiner meticulously considered each variance criterion in MMC 2.78.075. First, he determined that the height and setback variances did not constitute "a special privilege inconsistent with the limitation upon uses of other properties in the vicinity" because they were area, not use, variances and therefore were not a special privilege under *Hoberg v. City of Bellevue*.[30]

Second, he decided the variances were necessary because of special circumstances related to those listed in MMC 2.78.065(B).[31] The hearing examiner accepted T-Mobile's position that because of the existing vegetation and topography of Medina, a height variance for a 55-foot antenna was necessary to provide adequate coverage to Medina residents under the FTA.[32] This conclusion is supported by his uncontested findings and testimony in the record. Mike Corcoran, a radio frequency engineer at T-Mobile Wireless, testified that the variance was necessary to provide adequate service in Medina. He explained that T-Mobile planned to remove the WCF in Washington Park that currently serves much of the city because its height created service problems, interfering with all the other sites along the shoreline.[33] Once the Washington Park WCF is removed, north Medina would lose indoor cell phone services.[34] To rectify this problem and in accordance with its

---

[30] 76 Wn. App. 357, 360, 884 P.2d 1339 (1994) ("An area variance is one which does not change the specific land use but provides relief from dimensional requirements such as setback, yard size, lot coverage, frontage or height restrictions.").

[31] Former MMC 2.78.075(B) (2001) states:

That such variance is necessary, because of special circumstances relating to the size, shape, topography, location or surroundings of the subject property, to provide it with the use rights and privileges permitted to other properties in the vicinity and in the zone in which the subject property is located . . . .

[32] The FCC requires that cell phone companies provide service in the areas for which they receive a license from the FCC. Under the agreement, the applicant cannot allow gaps in its coverage area or dropped calls. *Id.*

[33] *Id.*

[34] *Id.*

policy of providing lower, localized WCFs,[35] it submitted an application to construct this WCF along the SR-520 corridor. The SR-520 corridor is one of two WCF areas the Medina City Council approved in the MMC.[36] Corcoran also explained that alternate sites considered by the Medina City Council would either fail to solve the problem or require similar variances. He testified that T-Mobile already had a WCF on the other site available to it, Overlake Golf Course, and raising that WCF would only create the same kind of interference with lower WCFs that required T-Mobile to remove the Washington Park facility. He also testified that other locations along the SR-520 corridor that are lower in elevation would require WCFs even higher than 55 feet, which would, again, ultimately lead to interference problems similar to those at the Washington Park facility. Finally, Corcoran noted that a 55-foot high tower was necessary in part because of the site conditions, specifically the terrain and the trees in the surrounding area.

The hearing examiner concluded the setback variance was necessary because special circumstances related to those listed in MMC 2.78.065(B) restricted use of the property. Specifically, the "topography, location [and] surroundings"[37] of the property reduced the number and type of potential uses for the site. Substantial evidence in the record also supports this conclusion. The proposed WCF site has a high elevation, relative to other areas of SR-520, has existing vegetation,[38] and is currently developed with a light standard.[39] In addition, the SR-520 corridor is one of two areas the Medina City Council identified as needing WCFs to serve Medina citizens and as an ideal area to

---

[35] *Id.*

[36] The Medina City Council contemplated that WCFs would be located "in the central portion of Overlake Golf and Country Club and along the 520 corridor." MMC 17.90.050, Policy 10.1, *City Attorney and Staff Comments.*

[37] Former MMC 2.78.075(B) (2001).

[38] *Id.*

[39] *Id.*

locate the facilities.[40] Without the setback variance, this property could not be used for that purpose. Based on these considerations, we cannot say the hearing examiner erroneously concluded that the variance was necessary "to provide it with the use rights and privileges permitted to other properties in the vicinity."[41]

▮ Finally, the hearing examiner ruled that granting the height and setback variances would not have a negative impact on residential property values in the vicinity, and the characteristics of those properties reduced the impact of the WCF on surrounding properties. This conclusion is supported by substantial evidence in the record. T-Mobile chose the location in part because of its potential for minimizing impacts and its ability to provide adequate service. It also posited that the WCF would not be materially detrimental to the public welfare because it would replace an existing light standard, the properties along the SR-520 corridor were oriented away from the site, and the area had existing vegetation and trees that would screen the WCF.[42] T-Mobile provided two limited market studies suggesting there is no evidence that WCFs have a negative impact on residential property values in the vicinity. The City provided contrary evidence, including planning consultant Joseph Gellings' opinion that the height and setback variances would likely impact public welfare and the Medina City Council's comments in the MMC that WCFs have a negative impact on property values. But none of that testimony is substantiated by any factual evidence. Nor did the City provide any evidence challenging T-Mobile's studies. Accordingly, the hearing examiner properly concluded

---

[40] The City argues that the MMC, in proposing the SR-520 right-of-way as an acceptable site for WCFs, was referring only to the areas east of this site where the applicant can meet the 500-foot setback. Whether this is true is unclear from the record or the City Attorney and Staff Comments in the MMC. The record does suggest, however, that if T-Mobile had placed the WCF farther east along the corridor, it would have required a height variance much greater than 55 feet—a fact the hearing examiner was free to consider in granting the variances.

[41] Former MMC 2.78.075(B) (2001).

[42] *See also* MMC 17.90.050, Policy 10.1, City Attorney and Staff Comments.

that based on the evidence before him, T-Mobile met its burden of showing the proposed WCF would not impact the public welfare or negatively affect surrounding property values.

■ We also reject the City's argument that the hearing examiner improperly shifted the burden of proof to the City. The City correctly notes that T-Mobile, as the entity seeking a variance, bears the burden of proof.[43] In this case, it is clear from the record that T-Mobile satisfied its burden by submitting two expert studies that concluded WCFs do not adversely affect neighboring property values.[44] The hearing examiner concluded that this evidence was sufficient to support the variance application. Because T-Mobile satisfied its burden, the hearing examiner properly shifted the burden to the City to rebut the studies. The City provided no substantiated evidence to the contrary,[45] so the reliability of the studies was unchallenged and remained sufficient

[43] *Douglass v. City of Spokane*, 25 Wn. App. 823, 829, 609 P.2d 979, *review denied*, 94 Wn.2d 1006 (1980).

[44] The City states that the hearing examiner determined that neither party satisfied its burden of proof. It does not cite to the record, but is likely referring to the hearing examiner's conclusions of law 3 and 6, in which he stated neither party "provided sufficient evidence related to the *potential decrease* in residential property values." (Emphasis added.) But he also stated that there was "uncontradicted evidence . . . that WCFs have *no negative impact* on residential property values." (Emphasis added.) Reading the conclusion as a whole, the hearing examiner does not state that T-Mobile never met its initial burden.

[45] *See Sprint Spectrum, L.P. v. Town of N. Stonington*, 12 F. Supp. 2d 247, 254 (D. Conn. 1998) (holding that in order for the Town Planning and Zoning Commission to deny a permit application based on property values, the Town bore the burden of putting evidence into the record tending to show such a negative impact). Like the hearing examiner in this case, courts have rejected similar unsupported opinions of citizens in other land use cases. *See Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 496 (2d Cir. 1999) (the volume and specificity of citizens' comments about WCF impact on property values were not adequate to satisfy the substantial evidence standard); *see also Seattle SMSA Ltd. P'ship v. San Juan County*, 88 F. Supp. 2d 1128 (W.D. Wash. 1997). The City cites *East v. King County*, 22 Wn. App. 247, 256, 589 P.2d 805 (1978), as support for its position that the City planner's recommendation to deny the variance should be given deference. In that case, the court gave great deference to the zoning adjuster and Board of Appeals' opinions on a conditional use permit because of their long familiarity with and expertise in interpreting the code. But the officials in *East* were not opining about property values, a subject beyond their expertise. Rather, the zoning adjuster and Board of Appeals in *East* are more akin to the hearing examiner in this case because, like him, they made the initial land use decision.

to support the variance.[46] As T-Mobile points out, shifting the burden in this situation is consistent with Washington law.[47]

In sum, we are not "left with the definite and firm conviction" a mistake has been committed.[48] To the contrary, the hearing examiner carefully applied each of the variance criteria set forth in MMC 2.78.065, and there is substantial evidence in the record supporting his decisions to grant the variances.[49]

### III. Special Use Permit

MMC 17.56.050 allows a hearing examiner to issue an SUP if the proposed use

A. Is compatible with the intent of the comprehensive plan for the city;

B. Has no materially detrimental effects on neighboring properties due to excessive noise, lighting or other interference with the peaceful use and possession of said neighboring properties[;]

C. Has been designed to minimize adverse effects on neighboring properties; [and]

D. Is consistent with applicable special use provisions of this code.

The City argues the design did not minimize effects on neighboring properties because it was in the highest point

---

[46] Why the City did not present any evidence upon which the City Council relied when formulating its comments in the MMC that WCFs affect property values is not clear.

[47] *See Van Sant v. City of Everett*, 69 Wn. App. 641, 648, 849 P.2d 1276 (1993) (in an action involving a nonconforming use, the hearing examiner did not err by shifting the burden of proof to the party challenging the use to show it had been discontinued once the property owner met its burden of showing that such a nonconforming use existed).

[48] *Lakeside Indus. v. Thurston County*, 119 Wn. App. 886, 894, 83 P.3d 433 (2004).

[49] The evidence supporting the height and setback variances amply supports the aboveground equipment variance as well. The City does not seriously challenge this variance.

of the SR-520 right-of-way, visible from several properties, 20 feet higher than the code allowed, and not located in the area of SR-520 where views would be shielded by the Forest Preserve or Bellevue Christian School. It also claims the hearing examiner issued the SUP only because he improperly assumed the facilities, as designed, were necessary to provide adequate wireless coverage. T-Mobile argues that the WCF was designed to minimize effects on the neighborhood, and the hearing examiner properly considered that issue separately from the height and setback variances. We agree with T-Mobile for two reasons.

First, the hearing examiner's findings support his conclusion that T-Mobile designed the WCF to minimize effects on neighboring properties. The WCF was designed to replace and be disguised as an existing light standard.[50] A light will be placed at a standard height of 28 feet. The WCF is to be painted with a nonglare paint that matches the existing light pole, and the wiring would be hidden within the tubular structure of the light pole. The WCF is to be located in an area of the SR-520 corridor where the nearest property is a park and the residences are generally oriented away from the WCF site. The WCF was sited and designed to minimize its height while creating adequate coverage. Although the City claims that the WCF was not sited in an area contemplated by the MMC, the hearing examiner's unchallenged findings contradict its assertion.[51] And, as we noted above, the City provides no citation to the record supporting its position that this area of SR-520 is not one of the sites referenced in the City Council's comments in the MMC. In sum, there is substantial evidence in the record to support the hearing examiner's conclusion.

Second, the hearing examiner properly considered MMC 17.56.050(C) and 17.56.050(D) separately. He noted in his

[50] According to the MCC, WCFs that are disguised to look like objects commonly found within the city have fewer negative impacts on the surrounding properties. MMC 17.90.050, Policy 4.

[51] In his findings and conclusions, the hearing examiner stated, "Without a variance, the site could not be used for the construction of WCFs, a use that was clearly contemplated by the Medina City Council."

findings that because T-Mobile satisfied the height and setback variance criteria, it necessarily satisfied the applicable special use provisions of chapter 17.90 MMC and thus satisfied MMC 17.56.050(D). As stated above, his decision to grant the variances was not clearly erroneous based on the law and the record. Accordingly, the hearing examiner properly concluded T-Mobile satisfied MMC 17.56.050(D). We affirm the trial court and the hearing examiner's decision to grant the SUP and the variances to T-Mobile.

We affirm.

ELLINGTON, A.C.J., and BECKER, J., concur.