[No. 27826-3-III.   Division Three.   February 4, 2010.]

LANZCE G. DOUGLASS, INC., ET AL., *Respondents*, v. THE CITY OF
SPOKANE VALLEY ET AL., *Defendants*, PONDEROSA NEIGHBORHOOD
ASSOCIATION, *Appellant*.

410

*David S. Mann* (of *Gendler & Mann LLP*), for appellant.

*Michael J. Murphy* and *Daniel C. Carmalt* (of *Groff Murphy PLLC*) and *William J. Crittenden*, for respondents.

¶1 SWEENEY, J. — A neighborhood association appeals a superior court order that reversed the decision of a hearing

examiner. The examiner had reversed a decision of the city planning division. The planning division permitted a housing development in the Ponderosa area of Spokane County, Washington, without first requiring an environmental impact statement. We have reviewed the record developed by the hearing examiner and conclude that his decision is well founded in both fact and law. And we, therefore, reverse the order of the superior court and remand to the City of Spokane Valley for preparation of the necessary environmental impact statement.

## FACTS

¶2 Lanzce G. Douglass Inc., Lanzce G. Douglass Investments LLC, and Lanzce G. Douglass (collectively Douglass) applied to the City of Spokane Valley (City) for approval of a preliminary plat to divide 17 acres into 81 single-family lots and for approval of a preliminary planned unit development (PUD) overlay for the Ponderosa area of Spokane County (County). Douglass applied one month later to the County for preliminary plat approval to subdivide an adjacent 28 acres of property into a 100-lot development called Ponderosa Ridge. Both properties are zoned low density residential, which allows six dwellings per acre. The Ponderosa Neighborhood Association (Neighborhood Association) has resisted further development in the area.

¶3 The Ponderosa area is about three square miles of land on the east side of Browne's Mountain. The area is covered with grasses, shrubs, and scattered pine trees. And the area has suffered numerous wildfires over the years, including a significant firestorm in October 1991. The firestorm in 1991 destroyed 14 homes and threatened an additional 105 homes near the site where these projects are proposed.

¶4 The County therefore began to require that development projects in the Ponderosa area address the need for access by fire-fighting vehicles and egress by residents during wildfires. For example, the County required one

developer to set aside $500 per lot to construct an additional access road. The County also denied two other applications for preliminary plats in the early 1990s because of concerns over evacuation.

¶5 Spokane County Fire District 8 opposed a project called Mica View Estates in 2001 because the roads serving the Ponderosa area could not safely handle a major evacuation or access by emergency vehicles. The County then installed a gated and locked railroad crossing north of Mica View Estates that provided emergency access into and out of the area. This was a temporary alternative to the construction of a new public access road in the Ponderosa area. And so the County approved the Mica View Estates project in 2003, but it also required that the developer set aside $500 per lot for a new railroad crossing when needed.

¶6 Douglass submitted a traffic impact analysis for both of its projects. Those studies included evaluations of the existing roads and specifically how those roads would handle evacuation in a wildfire emergency. One of two access sites into and out of the Ponderosa area is the intersection of Dishman-Mica and Schafer roads. It is controlled by a traffic signal. There were problems at this intersection during the 1991 firestorm. Congestion at the intersection inhibited evacuation of residents and made it difficult for emergency personnel to enter the area.

¶7 Douglass's traffic impact analysis assumed that all of the then-existing 1,281 homes in the Ponderosa area would be notified of an emergency at the same time and all could be evacuated within 30 minutes. And it concluded that residential development will actually "become itself a fire break to the overall Ponderosa neighborhood." Administrative Record (AR) at 4102. The analysis then concluded that the intersections in the study area would continue to function at acceptable levels even with the traffic from Douglass's proposed projects. The traffic impact study was revised in January 2005. The revised study noted that "[p]er the City of Spokane Valley, Firestorm and emergency access has not been included in this study." AR at 474.

¶8 A County hearing examiner approved the preliminary plat of Ponderosa Ridge in August 2005. The examiner concluded that the affected intersections would work with the help of emergency personnel. The Neighborhood Association challenged that decision in superior court pursuant to the Land Use Petition Act (LUPA), ch. 36.70C RCW. The superior court judge affirmed the decision of the examiner. And we later affirmed the court's decision to dismiss the LUPA petition. *Ponderosa Neighborhood Ass'n v. Spokane County*, noted at 141 Wn. App. 1031, 2007 WL 3349121, at *15, 2007 Wash. App. LEXIS 3014, at *42.

¶9 Douglass submitted a revised site plan to the City for the Ponderosa PUD in March 2007. And it completed the environmental checklist required by the State Environmental Policy Act (SEPA), ch. 43.21C RCW. The City issued a mitigated determination of nonsignificance. The mitigated determination of nonsignificance meant that Douglass did not have to prepare an environmental impact statement. The Neighborhood Association appealed the City's decision to approve the project. And the same hearing examiner who approved the Ponderosa Ridge project held a public hearing.

¶10 As part of the process, the hearing examiner conducted a statistical analysis. He concluded from this analysis that even under ideal conditions and using emergency personnel at the intersections, nearly 20 percent of the traffic from the existing houses and none of the traffic from the current project (or the Ponderosa Ridge project and others) could be evacuated from the area within 30 minutes.

¶11 He made appropriate findings of fact and he concluded that the City's mitigated determination of nonsignificance was clearly erroneous because the project is reasonably likely to have more than a moderate adverse effect on the environment. The hearing examiner then reversed the mitigated determination of nonsignificance "based on the lack of adequate community egress from the Ponderosa area in the event of a firestorm event that would require evacuation of the area." Clerk's Papers (CP) at 88

(Conclusion of Law 43). And he ordered the City planning division to issue a determination of significance. That determination would require an environmental impact study.

¶12 Douglass challenged the examiner's decision in superior court. The superior court agreed with Douglass and reversed the hearing examiner's decision. The court concluded that the examiner: (1) erred as a matter of law in stating that evacuation must occur within 30 minutes, (2) erred as a matter of law in rejecting the SEPA determination of the area's capacity for emergency egress, (3) did not have adequate support in the record for the finding that the Ponderosa area could not be evacuated within 30 minutes, (4) had no authority to order a determination of significance and should have left this to the discretion of the governing agency, (5) erred in concluding that the project does not have adequate provision for roads, and (6) erred in also denying project approval based on lack of County approval for the storm waste system. The Neighborhood Association appeals the court's decision to reverse the hearing examiner.

## DISCUSSION

STANDARDS OF REVIEW

¶13 We, like the trial judge, will review the decision of the hearing examiner, all of us sitting in an appellate capacity. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). And we must give substantial deference to both the legal and factual determinations of a hearing examiner as the local authority with expertise in land use regulations. *City of Medina v. T-Mobile USA, Inc.*, 123 Wn. App. 19, 24, 95 P.3d 377 (2004). We review the evidence and any inferences in a light most favorable to the party that prevailed in the highest forum exercising fact-finding authority (here the Neighborhood Association). *City of University Place v. McGuire*, 144 Wn.2d 640, 652, 30 P.3d 453 (2001); *Willapa Grays Harbor*

*Oyster Growers Ass'n v. Moby Dick Corp.*, 115 Wn. App. 417, 429, 62 P.3d 912 (2003). Douglass must show that the hearing examiner made a mistake of law, that the hearing examiner's decision is not supported by substantial evidence, or that the decision was clearly erroneous. *McGuire*, 144 Wn.2d at 647; RCW 36.70C.130(1).

DECISION UNDER REVIEW

¶14 The superior court reversed the hearing examiner essentially for two reasons: (1) the hearing examiner did not defer to the City's decision to issue a mitigated determination of nonsignificance and (2) the hearing examiner imposed a substantive 30-minute evacuation requirement on the preliminary plat. The Neighborhood Association contends this was wrong. Douglass responds that the standard of review is "clearly erroneous" and that this standard must be applied to the City's decision to issue the mitigated determination of nonsignificance. That is, at any level of review—hearing examiner, superior court, here in the court of appeals—great deference must be afforded to the municipality's land use decision. From this, Douglass argues that the trial judge correctly applied that standard when he concluded that the hearing examiner's conclusion that the Ponderosa area cannot be evacuated within 30 minutes was wrong. Moreover, Douglass argues, there is no legal requirement that the entire Ponderosa area be evacuated in 30 minutes. So the hearing examiner had no authority to impose such a requirement.

¶15 The City concluded that the Ponderosa PUD would not have a probable significant adverse impact on the environment. The only mitigation required by the City was that the developer protect any archaeological resources discovered during construction. The hearing examiner concluded, however, that the project "will add a significant volume of traffic to the already inadequate community egress from the Ponderosa area in the event of a wildfire or other emergency." CP at 87 (Conclusion of Law 27). And this conclusion then led to his further conclusions that the

project is therefore "reasonably likely to have more than a moderate adverse effect on the quality of the environment"; and that the mitigated determination of nonsignificance was therefore clearly erroneous. CP at 87 (Conclusion of Law 27). The hearing examiner's analytical approach here is sound.

THIRTY MINUTE EVACUATION REQUIREMENT

■ ■ ¶16 The first question is whether the evidence presented at the hearing supports the examiner's findings of fact. *McGuire*, 144 Wn.2d at 647. That is a decision we review for substantial evidence. *Id.* The next question is whether those findings support the examiner's conclusions of law; that is a decision that we review de novo. *McGuire*, 144 Wn.2d at 652; *Biermann v. City of Spokane*, 90 Wn. App. 816, 821, 960 P.2d 434 (1998). And the final decision for us is whether the examiner's decision to reject the City planning division's decision to approve the project based on a mitigated determination of nonsignificance is clearly erroneous; that is also a decision that we review de novo. *McGuire*, 144 Wn.2d at 647.

■ ¶17 Again, our review is of the administrative record developed at the hearing before the hearing examiner. *HJS Dev., Inc. v. Pierce County*, 148 Wn.2d 451, 483-84, 61 P.3d 1141 (2003).

■ ¶18 The hearing examiner concluded that

[t]he ability to evacuate the Ponderosa area in approximately 30 minutes during a wildfire event, such as the 1991 firestorm, is critical to public safety, considering the large number of homes and approved lots in the area, location of the community in an urban/wildland interface with a high wildfire hazard, the rate at which wildfire can spread in the area, and the lack of definitive evidence in the record that alternative strategies such as sheltering in place, or going to a place of safety, would be effective or have been planned for by emergency authorities.

CP at 85 (Conclusion of Law 18). First, this is not a conclusion of law; it is a finding of fact. A finding of fact is an

assertion that evidence shows something occurred or exists, independent of an assertion of its legal effect. *State v. Williams*, 96 Wn.2d 215, 221, 634 P.2d 868 (1981); *State v. Niedergang*, 43 Wn. App. 656, 658-59, 719 P.2d 576 (1986). And that is what we have here. The statement is a conclusion of law if the determination is made by a process of legal reasoning from the facts. *Niedergang*, 43 Wn. App. at 658-59. We review findings of fact that are improperly called conclusions of law as findings of fact. *State v. Marcum*, 24 Wn. App. 441, 445, 601 P.2d 975 (1979).

¶19 The hearing examiner summarizes evidence here. It is not the product of legal reasoning. *Niedergang*, 43 Wn. App. at 658-59. He does not require, as a matter of law, a 30-minute evacuation. Instead, he finds that the planning division did not consider the evacuation concerns of Fire District 1 or the county sheriff and did not have an opportunity to review the underlying data of the fire evacuation analysis or other evidence presented by the Neighborhood Association at the hearing. And, necessarily, preparation of an environmental impact statement would give the City the opportunity to do that. His legal conclusion (based on this finding) is that the project is reasonably likely to have more than a moderately adverse effect on the environment. And thus the hearing examiner concludes that the City's determination of nonsignificance is clearly erroneous.

¶20 The hearing examiner then gratuitously suggests strategies that might mitigate the threat of wildfire:

> 29. Preparation of an EIS [environmental impact statement] for the project would allow for consultation with local law enforcement, fire districts and emergency planning authorities regarding an evacuation plan for the Ponderosa, the search for and the feasibility of a third (3) public access, consideration of the various wildfire scenarios in the Ponderosa, and the exploration of other strategies to evacuation in wildfire events that may have merit in the Ponderosa area.
>
> . . . .
>
> 31. The preparation of an EIS may identify mitigation that would allow the project to proceed, with or without a propor-

tionate contribution by the applicant. A similar EIS process was used for Mica View Estates project, which resulted in the installation of the emergency crossing of the railroad in the southeast portion of the Ponderosa area, and ultimate approval of the project.

CP at 87.

¶21 Douglass argues that the hearing examiner denied the plat without citing specific standards in the development regulations. It cites to *Norco Construction, Inc. v. King County*.[1] There, the county refused to address a plat application that conformed to the comprehensive plan when filed but conflicted with a *proposed* comprehensive plan. The Supreme Court held that a county may not defer approval of a preliminary plat because it does not conform to anticipated changes in a comprehensive plan or ordinances. *Norco*, 97 Wn.2d at 682. *Norco* is then easily distinguishable from the facts here. There, the county based a land use decision on concerns that were not part of the existing regulatory scheme and might never become established policies. The evaluation here addresses pertinent environmental factors under existing SEPA laws. *Id.* at 689; *Jones v. Town of Woodway*, 70 Wn.2d 977, 425 P.2d 904 (1967).

■ ¶22 Approval of the plat here has not been denied. Instead, the examiner considered the inadequacy of the mitigated determination of nonsignificance given the evidence before him. And he determined that an environmental impact statement was necessary to address whether appropriate provisions have been made in the plat for public health and safety. RCW 58.17.110(1); former SPOKANE VALLEY MUN. CODE (SVMC) 18.20.020(A)(1)(i) (2007).

¶23 Douglass also argues that the record does not support the finding that the area cannot be evacuated within 30 minutes because it is based solely on the opinion of Thomas Cova, the Neighborhood Association's expert. We do not read the record that way.

---

[1] 97 Wn.2d 680, 649 P.2d 103 (1982).

¶24 Mr. Cova testified that there are no national, regional, or local requirements for evacuation within 30 minutes. But an article written by Mr. Cova for the August 2005 *Natural Hazards Review* entitled "Public Safety in the Urban-Wildland Interface: Should Fire-Prone Communities Have a Maximum Occupancy?" concluded that "if a community has a high fire hazard (or greater), then the minimum evacuation time should be at most 30 min[utes]." AR at 2858-67, 2863. The Ponderosa area has a high fire risk.

¶25 Douglass argues that the hearing examiner relied too much on Mr. Cova's testimony. But how much weight to give that testimony or any evidence is up to the hearing examiner. *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 34, 891 P.2d 29 (1995). And the record also shows that Spokane County Fire District 8 established fire district requirements for the proposed Ponderosa PUD in July 2004. Those requirements included an evacuation study:

> Final approval of plat shall be contingent on the completion of an evacuation study that will be conducted by Fire District 8 and other applicable agencies. The study will determine the ability to safely evacuate residents using the existing egress routes.
>
> . . . .
>
> Traffic study should cover the need for an evacuation and the capability of the road system exiting the Ponderosa development to handle approximately 5000-6000 vehicles in a set period of time.

AR at 5228; *see also* CP at 48 (Finding of Fact 225).

¶26 Todd Whipple is Douglass's traffic engineer. He prepared a fire evacuation analysis with the assistance of a Fire District 8 lieutenant. He based his model on a worst-case scenario—all of the then-existing 1,281 homes in the Ponderosa area trying to evacuate within the same 30 minutes. Mr. Whipple concluded that the intersection at Dishman-Mica/Schafer would be congested during an

evacuation given these conditions. Even so, he went on to conclude that traffic control at the intersections would allow for adequate evacuation because actual notice of evacuation would be door-to-door (staggering the number of vehicles on the road at one time).

¶27 The hearing examiner evaluated Mr. Whipple's conclusions using statistics and appropriate computer software. He used the same statistics and computer software that Mr. Whipple used. And he concluded that Mr. Whipple's analysis assumed ideal conditions: "that delay will not result from such potential human and firestorm factors as stalled vehicles, traffic accidents, lost visibility due to smoke, fallen trees, etc." CP at 64 (Finding of Fact 349). The hearing examiner found that the addition of the vehicles from the Ponderosa development and the contiguous Ponderosa Ridge project would be significantly higher through the two egress intersections than reflected in Douglass's evacuation analysis. The hearing examiner also noted that the evacuation analysis intentionally did not study lane or corridor capacity. That is important because falling trees or stalled vehicles could block a lane and affect traffic flow. The hearing examiner concluded that even under ideal traffic flow rates and with emergency personnel controlling the intersections, 20 percent of the current traffic and none of the additional traffic from the Ponderosa PUD could be evacuated within 30 minutes.

¶28 The standard of review here is substantial evidence. It requires that we accept the fact finder's determination of the credibility of the witnesses and of the weight given to reasonable but competing inferences. *Hilltop Terrace*, 126 Wn.2d at 34. Again, we will not substitute our judgment for that of the fact finder. *Id.* When viewed in the light most favorable to the Neighborhood Association, the evidence supports the hearing examiner's finding that vehicles from the Ponderosa project cannot evacuate the Ponderosa area within 30 minutes in the event of a wildfire emergency. *McGuire*, 144 Wn.2d at 652.

REVERSAL OF THE MITIGATED DETERMINATION OF NONSIGNIFICANCE

¶29 A jurisdiction's responsible official—in this case, the community development director within the planning division—makes a threshold determination of a proposed project's effect on the environment. RCW 43.21C.010, .033; SVMC 21.20.020. This threshold requirement permits local governments to consider all environmental and ecological factors before taking action that may significantly affect the quality of the environment. *King County v. Wash. State Boundary Review Bd.*, 122 Wn.2d 648, 659, 860 P.2d 1024 (1993) (quoting *Lassila v. City of Wenatchee*, 89 Wn.2d 804, 813, 576 P.2d 54 (1978)). The project proponent files a completed environmental checklist form with an application. SVMC 21.20.050. The agency issues a determination of nonsignificance if the director determines that the project will have no probable significant adverse environmental impacts. WAC 197-11-340(1); SVMC 21.20.070(A). The determination of nonsignificance is mitigated if the director attaches conditions, which then become conditions of approval. SVMC 21.20.080(A), (G). But if the director decides that a proposal "may have a probable significant adverse environmental impact," the agency issues a determination of significance and identifies the areas an environmental impact statement must focus on. WAC 197-11-360(1); RCW 43.21C.031; SVMC 21.20.100, .110.

¶30 Douglass filed an environmental checklist. The City planning division reviewed it. The transportation section of the checklist merely refers to the access from this project and the Ponderosa Ridge project. Concerns about public services including fire protection are not addressed. The planning division nonetheless concluded that the project would not have a probable significant adverse impact on the environment, if mitigated to protect archaeological resources.

¶31 We review a threshold determination that an environmental impact statement is not required by the clearly erroneous standard. *Norway Hill Pres. & Prot. Ass'n v. King*

*Cnty. Council*, 87 Wn.2d 267, 275, 552 P.2d 674 (1976); *Boehm v. City of Vancouver*, 111 Wn. App. 711, 718, 47 P.3d 137 (2002). Douglass contends that the hearing examiner failed to give due deference to the City planning division's mitigated determination of nonsignificance.

¶32 The responsible agency, here the City planning division, must show that it considered the relevant environmental factors and that its decision to issue a mitigated determination of nonsignificance was based on information sufficient to evaluate the proposal's environmental impact. RCW 43.21C.030(2)(c); *Wenatchee Sportsmen*, 141 Wn.2d at 176; *Lassila*, 89 Wn.2d at 813. We give substantial weight to the City's mitigated determination of nonsignificance and its decision to dispense with an environmental impact statement. RCW 43.21C.090; *Boehm*, 111 Wn. App. at 718.

¶33 The hearing examiner concluded that the mitigated determination of nonsignificance was clearly erroneous because "after reviewing the record as a whole, and according substantial weight to the MDNS [mitigated determination of nonsignificance]," he was "left with the definite and firm conviction that a mistake has been committed[,] even if there is some supporting evidence for the MDNS." CP at 84 (Conclusion of Law 12). The hearing examiner concluded that a "significant volume" of traffic from the project area "cannot be evacuated from the area in 30 minutes through the two Dishman-Mica exits." CP at 85 (Conclusion of Law 19). The fire evacuation analysis failed to consider the additional traffic generated by the Ponderosa development and other projects that had been approved in the Ponderosa area. And he concluded that "[s]uch additional trips are relevant in determining the cumulative impact on community egress during an evacuation, and the ability of project traffic to timely evacuate." *Id.*

¶34 Douglass contends the hearing examiner's decision effectively requires it to alleviate preexisting regional problems and it is not legally required to do that. *Benchmark Land Co. v. City of Battle Ground*, 146 Wn.2d 685, 695, 49 P.3d 860 (2002). In *Benchmark*, the city conditioned plat

approval on off-site road improvements that addressed a preexisting deficiency. A road did not meet the city's roadway standards even before the proposed development. And the expenditure for improvements was not tied to the traffic generated by the proposed development. *Id.* The Supreme Court held that a plat condition must be directly related to the traffic generated by the proposed development. *Id.*

¶35 Douglass's plat has not been conditioned on improving a preexisting deficiency. The hearing examiner here reversed the mitigated determination of nonsignificance and remanded for preparation of an environmental impact statement to address emergency evacuation. Yes, the hearing examiner refers to evacuation of the entire Ponderosa area and considers evidence that even the current population is inadequately served by the two egress roads. But his decision is not based on preexisting deficiencies. It focuses instead on the cumulative effect of the traffic from the Ponderosa development. An environmental impact statement analyzes the "direct, indirect, and cumulative impacts" of a proposed project. WAC 197-11-060(4)(e).

¶36 SEPA requires that decision makers consider more than the narrow, limited environmental impact of the current proposal. *Cheney v. City of Mountlake Terrace*, 87 Wn.2d 338, 344, 552 P.2d 184 (1976). And so the hearing examiner properly considered the impact of adding traffic from the Ponderosa PUD to the current egress roads. He concluded that an environmental impact statement was necessary to address what are probable significant adverse effects of the proposed project on the ability to safely evacuate the area. WAC 197-11-360(1); RCW 43.21C.031; SVMC 21.20.100, .110. That is an appropriate consideration and an appropriate conclusion.

¶37 An environmental impact statement must be prepared whenever significant adverse impacts on the environment are probable, not just when they are inevitable. *King County*, 122 Wn.2d at 663. *King County* notes that government approval of a land use proposal may "acquire virtually unstoppable administrative inertia." *Id.*

at 664. Postponement of environmental review allows project momentum to build, carrying the project forward even if adverse environmental effects are discovered later. *Id.* (quoting William H. Rodgers, Jr., *The Washington Environmental Policy Act*, 60 WASH. L. REV. 33, 54 (1984)).

¶38 Douglass suggests that the approval of several other development projects in the Ponderosa area, including Ponderosa Ridge, requires approval of this project without addressing the probable adverse environmental impacts of the cumulative impact. But at some point, population growth in an area will overwhelm the roads. The evidence supports the hearing examiner's findings that the City failed to adequately evaluate emergency evacuation (*see* CP at 85-86 (Conclusions of Law 18-25)), and those findings support the hearings examiner's conclusions that an environmental impact statement is necessary. *McGuire,* 144 Wn.2d at 652; *Hilltop Terrace,* 126 Wn.2d at 34.

¶39 In sum, if an environmental impact statement is required by the weight of evidence (as the examiner found) and if the responsible legislative authority does not require an environmental impact statement (as it did not here), then the decision is clearly erroneous. *King County,* 122 Wn.2d at 667; *Norway Hill,* 87 Wn.2d at 274.

HEARING EXAMINER RULING DOES NOT IMPLICATE THE COMPREHENSIVE PLAN AND DEVELOPMENT REGULATIONS

¶40 Douglass next contends that the hearing examiner actually found deficiencies in the comprehensive plan or regulations and then impermissibly attempted to use the permitting process rather than the appropriate comprehensive planning process to cure those deficiencies. RCW 36.70A.470(1)(a). We disagree.

¶41 The hearing examiner analyzed the project under the policies and terms of the interim comprehensive plan and the development regulations. *See* CP at 42, 49-50, 52, 57, 85 (Findings of Fact 179, 240-46, 260, 296; Conclusion of Law 17). The City's interim comprehensive plan requires that residential developments provide adequate road access

for fire district ingress and egress. The hearing examiner relied on section 1.03(8) of the City Road Standards. It requires an extra access road into a development for fire vehicles if the fire district has safety concerns. County Fire District 1 (one of two fire districts that serve the Ponderosa area) did have safety concerns. Resolution No. 2007-284, adopted by County Fire District 1, recommended that no further development be allowed in the Ponderosa area until a third public road for ingress/egress had been constructed. The comprehensive plan and existing road standard regulations accommodate a project analysis based on the adequacy of the roads for fire evacuation.

¶42 Project review requires "individual project decisions, not land use planning decisions." RCW 36.70A.470(1). Whether a project's specific probable adverse environmental impacts need to be mitigated does not implicate deficiencies in the comprehensive plan or development regulation. RCW 36.70A.470(3).[2] It is instead site specific and project specific. RCW 36.70A.470(1).

Authority To Order a Determination of Significance

■■■ ¶43 Finally, Douglass contends the hearing examiner did not have authority to order the City to issue a determination of significance under SEPA. It argues that this order improperly foreclosed the issuance of a revised mitigated determination of nonsignificance based on project changes or mitigation measures.

¶44 A hearing examiner is authorized to make land use decisions on preliminary plats and to hear appeals of SEPA determinations, including environmental determinations of PUDs. Former SVMC 18.20.020(A)(1) (2007). SEPA regulations state that the "responsible official" makes the threshold determination of significance. WAC 197-11-310(2).

---

[2] "For purposes of this section, a deficiency in a comprehensive plan or development regulation refers to the absence of required or potentially desirable contents of a comprehensive plan or development regulation. It does not refer to whether a development regulation addresses a project's probable specific adverse environmental impacts which the permitting agency could mitigate in the normal project review process." RCW 36.70A.470(3).

Douglass cites no authority, and we find none, that suggests that a hearing examiner may not, after hearing a SEPA appeal, reverse a threshold determination and remand for entry of a different threshold determination.

¶45 A threshold SEPA determination may be withdrawn when changes to a proposal create a significant adverse environmental impact (WAC 197-11-340(3)), when a mitigated determination continues to have a probable significant adverse impact even with mitigation measures (WAC 197-11--350(2)), or when changes to a proposed project prevent any probable significant adverse impact (WAC 197-11-360(4)).

¶46 The hearing examiner here reversed the mitigated determination of nonsignificance because he found it clearly erroneous. He then ordered the planning division to issue a threshold determination of significance so that an environmental impact statement may be prepared. WAC 197-11-360. But the hearing examiner did not and could not order a final determination of significance. And he did not. He suggested that preparation of the environmental impact statement may identify forms of mitigation that will allow the project to proceed with a different mitigated determination of nonsignificance. *See* CP at 87 (Conclusion of Law 31).

HOLDING

¶47 In sum, the hearing examiner did not deny Douglass's plat. He reversed the mitigated determination of nonsignificance and ordered preparation of an environmental impact statement because of the significant impact of the Ponderosa PUD development. The hearing examiner had authority to do this, and his decision is supported. The superior court, then, erred in reversing the decision of the hearing examiner.

¶48 We reverse the superior court.

KULIK, C.J., and BROWN, J., concur.

Reconsideration denied March 9, 2010.

Review denied at 169 Wn.2d 1014 (2010).