# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PHILLIPS 66 COMPANY, a Delaware company, | No. 82599-2-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| WHATCOM COUNTY WASHINGTON and FRIENDS OF THE SAN JUANS, a Washington nonprofit corporation, | |
| Respondents. | |

APPELWICK, J. — Phillips 66 challenges a condition imposed in a mitigated determination of nonsignificance issued by Whatcom County. The challenge is to the propriety of monitoring for increased vessel traffic in the Salish Sea when the County found that the project would not increase such traffic. The authority of the hearing examiner to revise the condition and make a final determination of the MDNS is also challenged. We affirm.

FACTS

Phillips 66 Company operates an oil refinery in Ferndale, Washington, close to the Salish Sea. Phillips 66 applied for permits to install new oil storage tanks approximately one-half mile from the sea. On May 15, 2019, Phillips 66 submitted a revised Washington State Environmental Policy Act[1] (SEPA) environmental

_____

[1] Chapter 43.21C RCW.

Citations and pin cites are based on the Westlaw online version of the cited material.

checklist. This checklist asked the applicant to provide information about the project to determine its environmental impacts. In that checklist, Phillips 66 stated, "The project does not require additional water, rail, or air transportation, as the project is focused on improving existing quality not capacity." On July 19, 2019, the Whatcom County (County) director of Planning and Development Services issued a mitigated determination of nonsignificance (MDNS) for Phillips 66's project. The MDNS gave a description of the project, along with four mitigating conditions required for Phillips 66 to follow to complete this project. The MDNS stated that an official review of Phillips 66's SEPA environmental checklist determined that "no significant adverse environmental impacts are likely." The County allowed public comments about the MDNS to be submitted through August 2, 2019.

The Friends of the San Juans (FSJ) is a group that "works to protect and recover the 113 endangered species in the Salish Sea." FSJ's marine protection program director responded to the MDNS during the open comment period. FSJ expressed concern about potential vessel traffic from this project harming the Southern Resident killer whales, an endangered species that resides in the vicinity of the shipping lanes used to traffic oil and oil products to Phillips 66's Ferndale refinery. FSJ's letter states, "[B]ecause [Phillips 66] did not provide direct answers regarding the additional vessel traffic associated with this project, Whatcom County did not address the proposed project's additional vessel traffic impacts to Southern Resident Killer Whales and increased oil spill risk." It asked for Phillips

66 to provide details on vessel traffic and for the County to reconsider the MDNS. Additionally, 28 citizens and groups responded to the MDNS during the public comment period, with many focusing on the issue of vessel traffic.

Following the comment period, on August 12, 2019, the County asked Phillips 66 to revise the SEPA environmental checklist to include a summary of additional vessel traffic. On August 16, 2019, Phillips 66 submitted a new SEPA checklist stating, "[T]he net effect on marine vessel traffic will not be increased." It also stated that "it would be wholly speculative to attempt to predict the number of marine vessels that will call upon the Phillips 66 marine terminal."

On August 20, 2019, the County issued a revised MDNS. This revision included the addition of "Condition F," which stated that Phillips 66 likely will have no adverse impacts on killer whale habitats, and that annual marine fuel oil vessel activity could be subject to additional SEPA review. "Condition F" states in full,

> According to the SEPA checklist prepared by the applicant, there is no material increase in marine vessel traffic expected as a consequence of the proposed project. Therefore, there are no likely significant adverse impacts to the habitat of the southern resident killer whale. To ensure there is no significant increase in marine vessel traffic resulting from the proposed project and, therefore, no likely significant adverse impacts to the habitat of endangered southern resident killer whales, the applicant shall monitor and report annually to PDS [(Planning and Development Services)] on the vessel trip activity at the marine terminal for inbound and outbound transport of inputs/outputs for processing marine fuel oils.
>
> The applicant shall utilize the Department of Ecology Advanced Notice of Transfer System (ANTS) to track and report marine fuel oil shipments by vessel. Vessel trips to/from the marine terminal that cumulatively exceeded the range of average annual marine fuel oil vessel activity identified in the 2017-2019 period (as identified in ANTS) may be subject to additional SEPA review.

On August 30, 2019, FSJ appealed the revised MDNS to the County Planning and Development Services, arguing that Phillips 66 did not quantify the additional vessel traffic associated with the project. The appeal asked that the County "[r]evise the MDNS with language clearly stating Whatcom County's intent to withdraw the MDNS and conduct additional SEPA review should vessel trips to/from the marine terminal exceed the average activity from the 2017-2019 period." It also asked the County to require the vessel traffic to be independently monitored going forward.

On November 1, 2019, a hearing examiner heard FSJ's administrative appeal. The hearing examiner reviewed whether Phillips 66 should quantify the vessel traffic and evaluate the vessel traffic's potential adverse impacts, and whether the MDNS should be revised to require review of the average vessel activity and monitoring of vessel activity. The hearing included testimony from various witnesses.

On November 17, 2019, the hearing examiner issued findings of fact, conclusions of law, and decision following the appeal.[2] The hearing examiner found that "the County has correctly determined that the permit and MDNS as issued should not present any additional risk or harm to the environment in general or the Killer Whales in particular. The evidence shows that there will be no increased vessel traffic." The hearing examiner upheld the MDNS with some changes. Changes included revisions and additions to Condition F, because "[t]he

---

[2] This decision was revised on November 26, 2019.

language used in the second paragraph of that condition F . . . was erroneously vague, as it set no standard, quantifiable or otherwise, as to what excess of the 'range of average annual marine fuel oil vessel activity' would in fact trigger additional SEPA review." (Emphasis omitted.) The hearing examiner changed the second paragraph of Condition F to state that if Phillips 66's average number of vessel trips increased, then the vessel trips would be subject to additional SEPA review. In this version, changes were made to the second paragraph of Condition F:

> The applicant shall utilize the Department of Ecology Advanced Notice of Transfer System (ANTS) to track and report marine fuel oil shipments by vessel. If vessel trips to/from the marine terminal cumulatively exceed the highest of the average annual marine fuel oil vessel activity identified in any calendar year from 2017 to 2019 (as identified in ANTS) this project shall be subject to additional SEPA review. As part of their annual reporting to PDS, the applicant shall arrange for PDS to receive the ANTS data.

(Emphasis added.)

Five days following this change, on November 21, 2019, Phillips 66 submitted a request for reconsideration arguing that "Condition F is legally invalid because it mitigates an environmental impact the Project does not cause." It also claimed that the condition was added for the legally invalid reason of quelling concerns raised in public comments. Phillips 66 noted that vessel traffic can increase for multiple reasons, so, "Condition F should be revised to clarify that its restrictions apply only to traffic associated with the tanks constructed under the Project."

The order on the motion for reconsideration stated that Phillips 66 had not timely appealed the first iteration of Condition F as stated in the August 20, 2019 MDNS. Additionally, the hearing examiner held that Condition F was properly changed to correct erroneously vague language and to give the proper purpose and meaning based on the record.

Phillips 66 appealed the November 17, 2019 findings of fact and conclusions of law in Whatcom County Superior Court. Its arguments included that Condition F was improperly added because of public pressure, that FSJ did not have standing to raise issues about vessel tracking on appeal, and that Condition F was improperly revised.

The superior court affirmed the final decision of the hearing examiner, including the revised Condition F.[3] The court stated, "Regarding Condition F, the Court finds no error in the hearings examiner's implementation and modification." Phillips 66 appealed the superior court's order affirming the County hearing examiner's findings of fact and conclusions of law.

## DISCUSSION

### I. Standard of Review

The Land Use Petition Act (LUPA), chapter 36.70C RCW, "governs judicial review of land use decisions." Cingular Wireless, LLC v. Thurston County, 131 Wn. App. 756, 767, 129 P.3d 300 (2006). In LUPA cases, the appellate court

---

[3] The court remanded to reinstate the original version of Condition E, but this is not at issue on appeal here.

reviews the record that was before the hearing examiner, including findings of fact and conclusions of law. City of Medina v. T-Mobile USA, Inc., 123 Wn. App. 19, 24, 95 P.3d 377 (2004). "'[W]e must give substantial deference to both the legal and factual determinations of a hearing examiner as the local authority with expertise in land use regulations.'" City of Federal Way v. Town & Country Real Estate, LLC, 161 Wn. App. 17, 38, 252 P.3d 382 (2011) (quoting Lanzce G. Douglass, Inc. v. City of Spokane Valley, 154 Wn. App. 408, 415, 225 P.3d 448 (2010)). We review any reasonable inferences in the light most favorable to the party that prevailed in the highest forum exercising fact-finding authority. T-Mobile, 123 Wn. App. at 24. In this case, because they prevailed before the hearing examiner, inferences are construed in favor of FSJ and the County.

Under LUPA, the court may "grant relief on a land use decision only if the party seeking relief has carried the burden of establishing that one of the [LUPA] standards is met." Cingular Wireless, 131 Wn. App. at 767. Because Phillips 66 sought relief under LUPA in superior court, it has the burden to meet one of the six standards set out in LUPA. See Town & Country, 161 Wn. App. at 36; RCW 36.70C.130(1). Phillips 66 argues that two LUPA standards apply here:

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
>
> . . . .
>
> (d) The land use decision is a clearly erroneous application of the law to the facts.

RCW 36.70C.130(1). Challenges under subsection (b) are legal questions that we review de novo, but only "'after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise.'" Town & Country, 161 Wn. App. at 37 (citation omitted) (quoting RCW 36.70C.130(1)(b)). Challenges brought under subsection (d) involve applying the law to the facts, reviewed under the "clearly erroneous" standard, which asks "'whether we are left with a definite and firm conviction that a mistake has been committed.'" Id. (quoting Cingular Wireless, 131 Wn. App. at 768).

II.  Exhaustion

On appeal, Phillips 66 argues that Condition F should be stricken in its original form and its revisions. However, "[a] person who claims to be aggrieved or adversely affected by a land use decision has standing to bring a land use petition only if he has exhausted his administrative remedies to the extent required by law." Thompson v. City of Mercer Island, 193 Wn. App. 653, 659, 375 P.3d 681 (2016); RCW 36.70C.060(2)(d). "[E]xhaustion of administrative remedies is a necessary prerequisite to obtaining a decision that qualifies as a 'land use decision' subject to judicial review under LUPA, whether the party seeking review is an owner, applicant, or other aggrieved party." Ward v. Bd. of County Comm'rs, 86 Wn. App. 266, 271, 936 P.2d 42 (1997). In Ward, a party did not appeal a decision to the administrative board within the 14 day time period, and the court found that this was a failure to exhaust administrative remedies. Id. at 269, 272.

The Whatcom County Code outlines the administrative process for appealing a land disturbance permit, the type of permit at issue here. For Type I and II applications, the director makes a final decision in the form of a written determination or permit, and either can be subject to modifications, conditions, or restrictions. WCC 22.05.110(1). Any person with standing has 14 days to appeal a final permit decision made by the director to the hearing examiner. WCC 22.05.160(1)(a).

Phillips 66 did not appeal or move to reconsider the imposition of the original language of Condition F within 14 days after it had been included in the MDNS. Phillips 66 failed to exhaust its administrative remedies as to the original Condition F. As a result, Phillips 66 cannot appeal the original language of Condition F to this court. Nevertheless, Phillips 66's standing to contest the modification of the condition by the hearing examiner is not at issue.

III.    Mitigation of Future, Speculative Impacts

Phillips 66 argues that the hearing examiner made improper revisions to Condition F in the MDNS. It argues the revisions to Condition F, requiring that future increased vessel traffic would be subjected to additional SEPA review, improperly mitigates future, speculative impacts. We review de novo whether the hearing examiner's alterations of the condition was an erroneous interpretation of the law. RCW 36.70C.130(1)(b); see Town & Country, 161 Wn. App. at 37.

9

To determine whether an environmental impact statement is required, an agency must determine whether there is a probable significant adverse environmental impact based on the SEPA checklist. WAC 197-11-330; WAC 197-11-960. A determination of nonsignificance (DNS) is a written decision by an agency indicating that a proposal will not have a significant adverse environmental impact. WAC 197-11-734. If a DNS is issued, an environmental impact statement (EIS) is not required. Id. A mitigated DNS (MDNS), allows an agency to consider changes or modifications to be made to a proposal that the agency or applicant will implement. WAC 197-11-350(1). Agencies can also clarify or change features of their own proposal, specify mitigation measures based on the public comment period, and specify procedures for enforcement for mitigation measures. WAC 197-11-350(5), (7). A mitigation measure must be related to "specific, adverse environmental impacts" and shall be stated in writing by the decision maker. WAC 197-11-660(1)(b). Mitigation includes "monitoring the impact and taking appropriate measures." WAC 197-11-768(6).

Here, Phillips 66 has conceded that environmental concerns, including harm to killer whales, could arise if vessel traffic increases. Phillips 66 "does not dispute that Southern Resident Killer Whales are endangered, or that increased vessel traffic poses a threat to that species." Expert opinions corroborated that increased vessel traffic would harm the whales. Clearly, if the evidence showed a probable increase in vessel traffic attributable to the project, an EIS would have been triggered. An MDNS would not have been an option.

When making impact determinations under SEPA, decision-makers are required to consider more than just the "narrow, limited environmental impact of the immediate, pending action." Cheney v. City of Mountlake Terrace, 87 Wn.2d 338, 344, 552 P.2d 184 (1976). Experts warned that increased oil storage capacity could increase vessel traffic in the future. Phillips 66 might change their usage in the future which would increase vessel traffic and cause harm to the whales. And, in that case, the County would not be able to exercise any regulatory review.

But, Phillips 66 argues that any risk of increased vessel traffic is speculative, and therefore Condition F is not related to probable impacts. Phillips 66's argument has a certain logic to it. The County determined there would be no probable increase in vessel traffic, and did not impose an express condition requiring that the project not increase vessel traffic to and from the refinery. "Probable" is defined as "likely or reasonably likely to occur," and is used "to distinguish likely impacts from those that merely have a possibility of occurring, but are remote or speculative." WAC 197-11-782.

Phillips 66 indicated multiple times throughout the process that installing the new oil tanks would not increase vessel traffic to and from the Ferndale facility. In its original SEPA checklist, Phillips 66 answered a question about increased traffic stating, "The project does not require additional water, rail, or air transportation, as the project is focused on improving existing quality not capacity." In its revised SEPA checklist, Phillips 66 reported that it will "produce and export less heavy fuel oil . . . so the net effect on marine vessel traffic will not be increased." In its

attachment to the SEPA appeal form, FSJ quoted Phillips 66's MDNS and revised MDNS, where Phillips 66 said, "[W]e can say with complete certainty that the Logistics Flexibility project will not materially affect the number of marine vessels utilizing the Phillips 66 marine terminal in any particular future time period."

Whether these assurances prove true is solely within Phillips 66's control. The County could have included a condition in the MDNS commanding that no increase would occur. But, in the record before us, the County was also entitled to rely on Phillips 66's representations as essential details of the project application.

Under either of its options, the County is entitled to monitor the project to make sure it complies with the application and any conditions imposed. WAC 197-11-350(7) ("Agencies may specify procedures for enforcement of mitigation measures in their agency SEPA procedures."); WAC 197-11-768(6) ("'Mitigation' means . . . [m]onitoring the impact and taking appropriate corrective measures.").

As written, Condition F makes Phillips 66 subject to SEPA review only if the vessel trips cumulatively exceed the highest of the average of vessel trips between 2017 and 2019. However, Phillips 66 argues that Condition F, as revised, will subject the company to additional SEPA review if increased traffic occurs for reasons outside of this project. It argues that this condition will impose broad restrictions on Phillips 66, as its vessel traffic could increase for reasons outside of this project, but that traffic would still be subject to review. FSJ acknowledges that Condition F cannot legally be the basis for imposing additional SEPA

12

restrictions based on increased vessel traffic not caused by the project. We agree. But, Phillips 66's argument is prematurely made here. The argument should be reserved for the time that any proceeding relating to increased vessel traffic is commenced.

The County had authority to impose Condition F to monitor impacts of the project as proposed by Phillips 66 in its application.

IV. Examiner's Authority

Phillips 66 also argues that the hearing examiner is authorized to affirm or deny the MDNS, but did not have authority to modify Condition F.

Authority to make final permit decisions is found in WCC 22.05.110:

(1) The director or designee's final decision on all Type I or II applications shall be in the form of a written determination or permit. The determination or permit may be granted subject to conditions, modifications, or restrictions that are necessary to comply with all applicable codes.

(2) The hearing examiner's final decision on all Type III applications per WCC 22.05.020 or appeals per WCC 22.05.160(1)[4] shall either grant or deny the application or appeal.

> (a) The hearing examiner may grant Type III applications subject to conditions, modifications or restrictions that the hearing examiner finds are necessary to make the application compatible with its environment, carry out the objectives and goals of the comprehensive plan, statutes, ordinances and regulations as well as other official policies and objectives of Whatcom County.

---

[4] WCC 22.05.160(1) grants the hearing examiner the authority to hear and decide appeals per WCC 2.11.210. WCC 2.11.210(K) authorizes the hearing examiner to review SEPA appeals.

Phillips 66 argues that this section allows the hearing examiner to impose conditions and modify grants of only Type III applications. That is true. But, unlike Type I and Type II decisions, the hearing examiner, not the director, is the initial county decision maker for Type III applications. WCC 22.05.020(1). Thus, the code clearly states that the hearing examiner has the same authority as the director to impose conditions in the first instance. WCC 22.05.110(2)(a). This subsection addresses only initial applications, not appellate authority, so we draw no inference from it as to the authority of the hearing examiner in its appellate role.

All parties agree that the permit in question is a Type I permit.[5] And, the hearing examiner is the appellate body for Type I and Type II applications. WCC 22.05.020(a). The authority of the hearing examiner is established in WCC 2.11.010 et seq. It authorizes a hearing examiner to make a final decision for appeals of a SEPA MDNS:

> In accordance with the provisions of Chapter 22.05 WCC, the hearing examiner shall conduct open record hearings and prepare a record thereof, and make a final decision upon the following matters:
>
> . . . .
>
> K.    Appeals from SEPA determinations of significance, determinations of nonsignificance, and mitigated determinations of nonsignificance.

WCC 2.11.210.

---

[5] The differences between the types of permits is outlined in WCC 22.05.020.

14

A closed record appellate review is limited to an affirmance or reversal of the issues on appeal. But, appeals of Type I and Type II applications require an open record public hearing. WCC 22.05.090. Such a hearing was held in this case. Taking testimony and evidence suggests the hearing examiner engaged in de novo decision making as to whether to grant or deny the appeal of the application. We conclude that incident to the de novo review, the hearing examiner was empowered to strike or add conditions to the MDNS, consistent with the evidence in the record, when reaching the final decision on open record review. And, the hearing examiner here did not add a condition to the MDNS. He merely clarified the condition imposed by the director. We hold the hearing examiner did not exceed his authority in doing so.[6]

Phillips 66 also contends that courts strictly construe the limits of a hearing examiner's jurisdiction. To support this statement, Phillips 66 relies on In re Jurisdiction of King County Hearing Exam'r, 135 Wn. App. 312, 320, 144 P.3d 345 (2006). There, we held that a hearing examiner could not deny an appeal and then order a supplemental environmental impact statement (EIS). See id. at 320-21. The court reached this decision because the King County Code specifically stated that the agency could issue a supplemental EIS, without specifically granting that authority to the hearing examiner. Id. That case is clearly inapposite.

---

[6] Phillips 66 also argues that, under WCC 16.08.170(4), the hearing examiner can reverse the SEPA DNS threshold determination only if it is clearly erroneous. It argues the determination was not clearly erroneous, and the hearing examiner erred by not affirming the director's determination. Since the hearing examiner did not reverse the threshold determination, we need not address whether he applied the correct standard.

Phillips 66 has failed to demonstrate that the hearing examiner lacked authority to clarify or modify Condition F of the MDNS.  Phillips 66 has also failed to demonstrate that the revision of Condition F was erroneous under the LUPA standards set forth in RCW 36.70C.130(1)(b) or (d).

We affirm.

_Appelwick, J._

WE CONCUR:

_Coburn, J._

_Verellen, J._