IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MICHELLE L. REID, | ) | |
| | ) | No. 38489-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASON A. REID, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Jason Reid appeals the superior court's denial of his motion to vacate an order of default and $267,700 default judgment entered in favor of his ex-wife, Michelle Reid. Michelle had sued Jason[1] for damages incurred when, postdivorce, and in violation of a restraining order, he broke into her home and accosted her and their three children. Although Jason was served with a summons and complaint in the action, he sought to set aside the order of default and judgment on the basis of excusable neglect, claiming that in the context in which the documents were served (during his arrest) he reasonably failed to review them.

The trial court ruled that Jason failed to demonstrate any of the four equitable factors that are considered in deciding whether to vacate a default judgment under

---

[1] Given the common last name of the parties, we refer to them by their first names for clarity. We intend no disrespect.

No. 38489-6-III
*Reid v. Reid*

CR 60(b)(1).  While we disagree that Jason failed to demonstrate due diligence, we agree

with the trial court that none of the other factors were shown.  We affirm.

FACTS AND PROCEDURAL BACKGROUND

Michelle and Jason Reid were married for almost 20 years and have four children

together.  At the time of the break-in that led to this lawsuit, three of the children were

still living with Michelle: two daughters, 16-year-old K.R. and 2-year-old H.R, and a son,

11-year-old C.R.[2]

The couple separated in 2012 and then reconciled.  According to Michelle, their

reconciliation was followed by a five-year decline in Jason's behavioral health, leading to

problems at work and home.  The couple permanently separated in 2017, after which the

family law court entered multiple restraining orders against Jason during the dissolution

proceedings.  Jason continually disregarded the orders, leading to his arrest on one

occasion and the entry of warrants for his arrest for other violations.  The divorce became

final in August 2018 and included a no-contact order against Jason.

Shortly after midnight on the morning of November 10, 2018, Michelle was

sleeping in her upstairs bedroom with H.R. when she woke up to the sound of her dog

barking.  On rising from the bed, she saw Jason outside her window.  We describe the

---

[2] Initials are used to protect the privacy interests of the children.  Gen. Orders of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/ ?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III.

2

events of that evening based on her account and the information gathered by police and later relied on in prosecuting Jason.

Jason had reached the bedroom window with a ladder taken from a shed, whose lock he had cut. Michelle yelled at him to leave, but Jason only shouted back at her and with one punch broke both panes of glass and began tearing through the window screen. Michelle grabbed H.R. and her phone and ran downstairs, where K.R. and C.R. had been sleeping in their bedrooms. K.R. had been awakened by the sound of glass shattering, and Michelle entered her room, tossed her the phone and said, "dad's breaking in," before "barricad[ing her]self" against the door. 1 Report of Proceedings (RP) at 11.[3] She listened as Jason methodically moved through the house, opening doors in search of her. His hands had been cut when he broke the window, and he left a trail of blood along the carpet, door knobs, and banister.

When Jason met resistance turning the knob on the door to K.R.'s room, he shoved his shoulder against the door, overpowering Michelle's efforts to keep him out. Michelle grabbed H.R., who she had placed on the bed, and stood between Jason and her daughters. According to Michelle, when her ex-husband saw that K.R. was on the phone (K.R. had called 911), he knocked Michelle and H.R. to the ground, grabbed K.R. and

---

[3] Our record includes two, nonconsecutively paginated reports of proceedings. We refer to the report of the hearing on the motion for default judgment as "1 RP," and the report of the hearing on the motion to vacate that judgment as "2 RP."

put her in a headlock before wresting the phone from her. C.R. had awakened when his father looked into his room before testing K.R.'s door, and he entered K.R.'s room. Seeing his father's bleeding hands, he asked if he should get him a towel. Michelle told him no, that he should go back to his room and stay there. Jason agreed. Michelle took advantage of the opportunity to tell K.R. to go get a towel for Jason, silently mouthing to K.R. to "go get Jay"—a neighbor. 1 RP at 15. K.R. stated she would get a towel, and left.

When Jason heard K.R.'s footsteps quicken once outside the room, he realized what was happening and took off after K.R. Michelle grabbed the phone that he left behind and was able to answer a return call from a 911 operator while running after Jason. K.R. had reached Jay's porch and was banging on his front door, screaming for help, when Jason caught up with her, grabbed her, and physically forced her to return home. Jay had awakened and, seeing what happened, placed his own 911 call.

Back inside the Reid home, Jason seized the phone from Michelle, disconnected the call, and forced her, H.R., and K.R. to sit on the living room couch. Standing over Michelle and the children, he said, "I didn't know what I was going to do tonight and I still don't know." 1 RP at 18. At that point, however, the lights of responding sheriff's deputies were seen outside and a spotlight scanned the home. Jason was arrested. In a

4

backpack that Jason had left in Michelle's bedroom, responding officers found knives, military grade handcuffs, and lockpicking tools.

Jason was charged with first degree burglary, violation of a no-contact order, and two counts of fourth degree assault. All were charged as domestic violence offenses. In March 2020, he pleaded guilty to the burglary, court-order violation, and one of the assault charges.

Michelle retained attorneys who prepared a summons and complaint for a civil action against Jason in the beginning of June 2020. She sought to recover damages for battery, outrage, and trespass for the 2018 break-in. Her lawyer later represented to the court that after preparing the complaint he tried to have Jason served in and out of custody without success before learning that Jason was due to report to a parole officer on July 6, 2020. The lawyer arranged for Jason to be served at that time.

Michelle filed her lawsuit and proof of service on July 28, 2020, and moved for default at that time. An order of default was entered on August 5, 2020. A motion for default judgment was filed on August 13, 2020, which sought damages for the cost of repairs and cleaning required by the break in, the projected cost of the family's relocation to a place where Michelle hoped Jason would be unable to find them, and noneconomic damages for emotional distress. Michelle's noneconomic damage request was for $250,000. She supported her damages request with a 15-page declaration that included

pictures of the blood trail left by Jason during the break-in and the weapons and tools that had been found in his backpack. She attached exhibits documenting her expenses and Jason's prosecution and guilty plea.

Given the substantial request for noneconomic damages, the trial court scheduled a hearing and requested that Michelle appear and testify. The hearing was held on August 21, 2020.[4] Jason was not present. In a hearing that appears to have lasted about an hour, Michelle's lawyer examined her about the break-in and the aftermath.

Asked what she believed had been Jason's intention in breaking in, Michelle testified that in the weeks before it happened, Jason had become obsessed with whether she had moved on to another relationship. She believed he hoped to catch her with someone else, wreak vengeance on that person, and kill her. She believed he would have taken the two younger children. She suspected the handcuffs he brought were intended for K.R., who Jason probably believed would refuse to go with him.

She testified that following his arrest in 2018, Jason had been in and out of custody, placing her and the children in recurring cycles of fear. She testified that she and the children were all in counseling and that she and the older children were on anxiety medications. She testified that she and K.R. were frequently triggered to relive

---

[4] Later, at the hearing on the motion to set aside the default judgment, the court hearing that motion mistakenly stated that the default judgment hearing had been held on August 13. The motion for default judgment was filed on that date, but it is clear from the report of proceedings and the clerk's papers that the hearing took place on August 21.

6

the fear they had experienced. She knew from Jason's efforts to obtain information about her from friends and neighbors and by his attention to her when she was required to attend court that he was still preoccupied with her. She had installed a complete security system and made all of her neighbors aware of the risk presented by Jason, especially when he was not in jail. She had obtained a concealed carry permit, had acquired multiple guns, and when the family returned after being absent from the home, she would routinely clear it, gun in hand, "[r]oom to room, every closet." 1 RP at 23.

She testified that she believed it was necessary to leave Spokane with her three younger children, even though it would mean moving away from her parents and her adult son. She explained:

> This is just never going to stop. . . . He does not care about the law, he does not care about the rules, he doesn't care about his restrictions or his boundaries. . . . He admitted to his probation officer that the people he is choosing to talk to about me, he knows that they are going to relay it back to me. And so it's a continued effort that he is doing right now and it's just never going to stop until he's no longer with us.

1 RP at 27.

The trial judge asked her own questions following Michelle's questioning by counsel. She pinned down details of Jason's history of court-order violations and particulars about the economic damages being claimed. She determined that Michelle had been provided an estimate of the cost of relocating that was higher than the damages she had requested in her complaint and declaration. At the conclusion of the hearing, the

7

judge announced that she would enter judgment in the amount of $267,700, which included the amounts being requested by Michelle plus the additional cost of relocation established by her testimony. The judge commented that while Michelle had done a good job of providing the facts, "[t]here were times where her emotions overcame her" and "[s]he was crying and distraught," which, along with the facts, tended to substantiate her emotional distress. 1 RP at 41. She observed that the $250,000 being requested for noneconomic loss was a large amount, "but at the same time, from my perspective, there's no amount of money that will give [Michelle] her safety back, her family back to a normal pre-assault status. It's just not possible to do that. I do think the $250,000 dollars is reasonable, and I will award that amount." *Id.* at 41-42.

The default judgment was entered on August 28, 2020. On October 23, 2020, approximately $36,000 of the judgment amount was satisfied by a sale of the Reids' home.

On April 16, 2021, Jason, represented by counsel, moved to vacate the default judgment. In a supporting declaration executed on March 23, 2021, he stated, "I didn't find out about this default judgment until about a month ago when my attorney came across it." Clerk's Papers (CP) at 79. His declaration admitted to having broken into the home, but he claimed he had only wanted to talk to members of his family and he denied using physical force against any family member. He explained that he failed to respond

to the complaint served on him the prior July because he assumed the paperwork was "part of the extensive divorce litigation I was going through" and following his arrest he was taken by bus to a detention center in Walla Walla, "with none of my belongings or paperwork." *Id.* He testified he did "not recall" the summons and complaint being included in the personal effects given to him upon his release from Walla Walla. *Id.* He described his life as having been "in chaos" with no money or consistent place to live after his release, and he had been rejailed since early the prior October when his parole was again revoked. *Id.*

In opposition to the motion to vacate the default, Michelle filed a declaration from Department of Corrections (DOC) Community Corrections Officer (CCO) Jeremy Wilson, who testified that when served with the summons and complaint at DOC offices, "Defendant Reid was offered the opportunity to review the legal documents at this time, but refused." CP at 99-100. He testified that the summons and complaint were stored by the DOC with Jason's other personal effects and were available to him. He testified that Jason was released from DOC custody on August 12, 2020, and was provided at that time with all of his personal effects, including the summons and complaint.

In reply, Jason filed a further declaration in which he testified that as soon as he arrived to meet with his probation officer on July 6, 2020, he was placed under arrest and "was immediately chained by the waist with my hands at my sides," was surrounded by

"between six to eight police officers at all times," and, when the process server arrived, "I could barely sign with my hands chained to my side," and "was unable to review my papers due to my constraints and the pressure from all of the surrounding officers." CP at 111.

The motion to vacate the judgment was presented to a judge other than the judge who had entered the default judgment. This second judge entered an order to show cause and presided at the hearing on the return. At the hearing, Jason argued he had defenses to liability and the damages. On the issue of damages, he argued that a trial would show that Michelle intended to relocate even if the break-in never occurred. Relatedly, he protested the noneconomic damages awarded because the cost of relocation was "speculative," the break-in was "short-lived," and Michelle's noneconomic damages stemmed from a purely psychological injury. 2 RP at 7, 9.

The trial court denied his motion, ruling that he had failed to demonstrate any of the equitable factors that can support setting aside a default judgment. Jason appeals.

ANALYSIS

The civil rules generally afford a defendant served with a summons and complaint 20 days within which to serve a copy of his or her defense. CR 4(a)(2). When the defendant fails to timely appear, plead or otherwise defend, the civil rules permit the

10

plaintiff to move for default under CR 55(a) without further notice, and not long thereafter, to move for entry of a judgment, again without further notice.

Jason emphasizes that default judgments are not favored as a general matter. "'[I]t is the policy of the law that controversies be determined on the merits rather than by default.'" *Griggs v. Averbeck Realty, Inc.*, 92 Wn.2d 576, 581, 599 P.2d 1289 (1979) (alteration in original) (quoting *Dlouhy v. Dlouhy*, 55 Wn.2d 718, 721, 349 P.2d 1073 (1960)). Yet a default and default judgment may not be entered unless the defaulting party has failed to respond, so the burden is on the defaulting party to demonstrate circumstances that justify setting them aside. For good cause shown and upon such terms as the court deems just, the court may set aside an entry of default. CR 55(c). If judgment by default has been entered, it may be set aside in accordance with CR 60(b).

Jason's motion to vacate Michelle's default judgment was based on CR 60(b)(1), which authorizes the trial court to relieve a party from a judgment for "[m]istakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order." The longstanding showing that supports vacating a default judgment for these reasons is "(1) that there is substantial evidence supporting a prima facie defense; (2) that the failure to timely appear and answer was due to mistake, inadvertence, surprise, or excusable neglect; (3) that the defendant acted with due diligence after notice of the default judgment; and (4) that the plaintiff will not suffer a substantial hardship if the

11

default judgment is vacated." *Little v. King*, 160 Wn.2d 696, 703-04, 161 P.3d 345 (2007) (citing *White v. Holm*, 73 Wn.2d 348, 352, 438 P.2d 581 (1968)).

The first two factors are the major elements to be demonstrated by the moving party. *White*, 73 Wn.2d at 352. When the moving party is able to demonstrate a strong or virtually conclusive defense to the opponent's claim, "scant time will be spent inquiring into the reasons which occasioned entry of the default, provided the moving party is timely with his application and the failure to properly appear in the action in the first instance was not willful." *Id.* On the other hand, if the moving party demonstrates a weaker defense but one that would, prima facie at least, warrant a trial on the merits, the reasons for his failure to timely appear in the action before the default will be scrutinized with greater care, as will his diligence after notice of the default, and the potential hardship on the opposing party. *Id.* at 352-53.

In determining the primary factor of whether the CR 60 movant has presented substantial evidence of a prima facie defense, the court reviews the evidence in the light most favorable to the moving party. *Pfaff v. State Farm Mut. Auto. Ins. Co.*, 103 Wn. App. 829, 834, 14 P.3d 837 (2000). This is consistent with the primary purpose for requiring a meritorious defense, which is to avoid the useless trial that would occur if the defendant has no factual basis on which to defend. *Griggs*, 92 Wn.2d at 583.

The trial court does not assess evidence of the second, excusable neglect factor in the light most favorable to the defendant, however. *VanderStoep v. Guthrie*, 200 Wn. App. 507, 526, 402 P.3d 883 (2017). The trial court may make credibility determinations and weigh the evidence in order to determine whether the defendant can show mistake, inadvertence, or excusable neglect. *Id.*

We review a trial court's decision on a motion to set aside a default judgment for abuse of discretion. *Little*, 160 Wn.2d at 702 (citing *Yeck v. Dep't of Lab. & Indus.*, 27 Wn.2d 92, 95, 176 P.2d 359 (1947)). An abuse of discretion is more readily found when the trial court denies a trial on the merits than when a judgment is set aside and a trial is had. *White*, 73 Wn.2d at 351-52.

A party can rely on CR 60(b)(1) to request the setting-aside of an allegedly excessive default damage award without also seeking to set aside the finding of liability. *Evans v. Firl*, No. 38364-4-III, slip op. at 13 (Wash. Ct. App. Jan. 31, 2023). When a default damage award determined under CR 55(b)(2) is challenged as excessive, Washington cases recognize three ways of addressing *White*'s prima facie defense factor. *Id.* One is a fact-based showing of a defense; a second is excuse-based, pointing to the difficulty of rebutting a large general-damages claim without the benefit of discovery; and the third is a challenge to the legal sufficiency of evidence to support the damage award. *Id.*

13

Jason makes six assignments of error, which we analyze as raising five issues: whether the trial court erred in making adverse findings or conclusions on the four *White* factors, and whether it erred in denying the motion to vacate the default judgment.

I.      THE TRIAL COURT DID NOT ERR IN CONCLUDING THAT JASON FAILED TO DEMONSTRATE A PRIMA FACIE DEFENSE

Jason's third assignment of error challenges paragraph 7 of the trial court's findings and conclusions, in which the trial court concludes that Jason did not present evidence of a meritorious defense to liability and it is unable to find substantial evidence of a meritorious defense. The court found the following facts[5] in that paragraph:

> In the corresponding criminal matter, Defendant Reid plead guilty to first degree burglary, assault and violation of existing protection orders, and . . . [e]ven in his declaration, Defendant Reid admits to breaking into the Plaintiff's house.

CP at 121, ¶ 7.

While error is assigned to the conclusion speaking to liability, we agree with Michelle that the argument section of Jason's appellate brief seeks relief from only what he claims are excessive damages. *E.g.*, Opening Br. of Appellant at 11 ("so that the damages could be heard on their merits"), 12 ("2. The Court erred [in] concluding Mr.

_____

[5] A finding of fact is an assertion that evidence shows something occurred or exists, independent of an assertion of its legal effect, while a statement is a conclusion of law if the determination is made by a process of legal reasoning from the facts. *Lanzce G. Douglass, Inc. v. City of Spokane Valley*, 154 Wn. App. 408, 417-18, 225 P.3d 448 (2010).

14

Reid did not present a . . . defense to the damages" (boldface omitted)), 13-14 ("Mr. Reid

supplied . . . [a] defense to the damages"), 14 ("Mr. Reid provided a defense to the

damages."). Reasonably read, Jason's brief abandons any defense to liability.

In moving to vacate Michelle's judgment in the trial court, Jason sought a trial on

liability and damages. But preservation of error in the lower court is not a substitute for

adequately identifying in the opening brief in *this* court the errors and issues an appellant

seeks to have reviewed. Parties on appeal must present argument in support of the issues

they identify on appeal "with citations to legal authority and references to relevant parts

of the record." RAP 10.3(a)(6). We will not review an issue included as an assignment

of error if it is unsupported by legal argument. *Brownfield v. City of Yakima*, 178 Wn.

App. 850, 876, 316 P.3d 520 (2013).

Jason seeks to provide the required argument in his reply brief. But his

identification of what is at best a minimal and tenuous defense to liability in the reply

brief comes too late.[6] *Cramer v. PEMCO Ins. Co.*, 67 Wn. App. 563, 567, 842 P.2d 479

---

[6] Jason engages in his reply brief a comparative analysis of the elements of his criminal convictions and the elements of Michelle's tort claims. Whether he presented "substantial evidence" of a defense requires consideration of his two declarations and the police reports and affidavit of probable cause he agreed could provide the factual basis for his guilty plea. Collectively, Jason admits in those materials that he trespassed, in the middle of the night, in violation of a no-contact order, and that he broke and climbed in through a bedroom window, taking Michelle's phone from both her and K.R. to prevent them from contacting 911. He admitted that breaking into the house was an "extreme" act. CP at 78.

(1992) (declining to review an issue raised for the first time in reply because it deprived the respondent of the opportunity to answer the claim); *City of Spokane v. White*, 102 Wn. App. 955, 963, 10 P.3d 1095 (2000) (same); *see also* RAP 10.3(c) ("A reply brief should . . . be limited to a response to the issues in the brief to which the reply brief is directed."). It works an injustice on Michelle and frustrates this court's review to entertain an argument in the reply brief to which we have no response.

Turning to Jason's challenge to damages, in this court's recent decision in *Evans*, we examined the three ways a defaulting party can address *White*'s prima facie defense factor when a default damage award under CR 55(b)(2) is challenged. Jason relies exclusively on the excuse-based showing first recognized by this court in *Calhoun v. Merritt*, 46 Wn. App. 616, 731 P.2d 1094 (1986). Opening Br. of Appellant at 12-14. In *Calhoun*, this court allowed the prima facie defense factor to be addressed by an explanation why the defendant would have difficulty presenting a defense without discovery. *Evans*, slip op. at 17. *Calhoun* recognized that developing a defense to the general damages would require the examination of Calhoun by a defense expert, and presenting the defense was "complicated by the subjective . . . nature of such damages." 46 Wn. App. at 620. "Taking the position that 'it would be inequitable and unjust' to

---

This is at best a minimal, tenuous defense that would require "scrutiniz[ing] with . . . care" the other three *White* factors. *White*, 73 Wn.2d at 352-53. As discussed hereafter, Jason fails to make a strong showing on the second and fourth factors.

deny the motion to vacate for failure to present a prima facie defense, this court looked to *White*'s three remaining considerations and concluded that they weighed in favor of vacating the damages." *Evans*, slip op. at 18 (quoting *Calhoun*, 46 Wn. App. at 620).

Later cases recognize that the difficulty of responding to noneconomic damages without discovery cannot operate as a general rule requiring that all such default judgments be vacated, because "no default judgment could ever stand," since a default judgment "by definition is entered before the discovery phase of litigation begins." *Farmer's Ins. Co. v. Waxman Indus., Inc.*, 132 Wn. App. 142, 147, 130 P.3d 874 (2006). Merritt's excuse for being unable to present a fact-based excuse was accepted in *Calhoun* "where he was able to make strong showings on the second, third, and fourth *White* factors." *Evans*, slip op. at 28. Absent a strong showing of an excusable failure to appear and due diligence, equity does not support excusing the defaulting party's inability to demonstrate a fact-based defense. As discussed hereafter, Jason does not demonstrate an excuse for failing to appear, the second primary factor, or that Michelle would not suffer substantial hardship if the judgment is set aside, the fourth secondary factor.

In theory, Jason could challenge the legal sufficiency of Michelle's evidence to support her damages, relying on *Shepard Ambulance, Inc. v. Helsell, Fetterman, Martin, Todd & Hokanson*, 95 Wn. App. 231, 242, 974 P.2d 1275 (1999); *see also Evans*, slip op. at 20-24. But Michelle's evidence in support of the damages is legally sufficient. She

17

provided substantial documentary support and live testimony. Evidence of emotional distress can be provided by the plaintiff's own testimony, and no corroboration is required. *Bunch v. King County Dep't of Youth Servs.*, 155 Wn.2d 165, 181, 116 P.3d 381 (2005) (affirming a $260,000 award of damages for emotional distress in a discrimination case). The trial court's decision to conduct a hearing in this case because of the substantial noneconomic damage request was a conscientious application and clearly adequate compliance with CR 55(b)(2).

The trial court did not abuse its discretion in concluding that Jason did not demonstrate the first *White* factor.

II. THE TRIAL COURT DID NOT ERR IN DETERMINING THAT JASON FAILED TO DEMONSTRATE MISTAKE, INADVERTENCE, SURPRISE, OR EXCUSABLE NEGLECT

Jason's second, fourth, and fifth assignments of error contend that the trial court erred in findings bearing on his excuse for failing to appear. His briefing on appeal speaks of oral findings made by the court at the hearing, but since those oral findings are not incorporated in the court's order, they are not the findings we review. *State v. Sims*, 193 Wn.2d 86, 99, 441 P.3d 262 (2019). The following factual findings bearing on Jason's excuse for failing to appear are made in paragraphs 2, 8 and 9 of the findings and conclusions:

> While in custody at the DOC, Defendant Reid had the opportunity to access the Summons and Complaint and review them with his attorney but did not do so.

18

CP at 120, ¶ 2;

> Defendant Reid testified that he chose not to read the summons and
> complaint because he thought it concerned his divorce. . . .  Further, the
> Defendant had the opportunity both in and out of DOC custody to examine
> the summons and complaint and respond prior to the entry of the default
> judgment but chose not to.

CP at 121, ¶ 8; and

> Defendant Reid states in his declaration that he did not read the Summons
> and Complaint because he thought it concerned a divorce proceeding.
> Defendant Reid could have requested access to the Summons and
> Complaint while in DOC custody but chose not to.  On August 12, 2020,
> Defendant Reid was released from DOC custody and the pleadings were
> returned to him.  This occurred prior to entry of the Default Judgment, but
> Defendant Reid failed to take action to respond to this matter.

CP at 121, ¶ 9.  Paragraphs 8 and 9 include legal conclusions that "[a] decision not to

read a properly served summons and complaint is not excusable neglect, a mistake,

inadvertence, or surprise," and "the Defendant's failure to respond to the Summons and

Complaint was not the result of mistake, inadvertence, surprise or excusable neglect."

CP at 121.

A party seeking to set aside a default must be prepared to show as the second

*White* factor that their failure to timely appear and answer was due to mistake,

inadvertence, surprise, or excusable neglect.  73 Wn.2d at 352.  The trial court has broad

discretion in deciding the issue of excusable neglect and may make credibility

determinations and weigh facts in order to resolve it.  *Rosander v. Nightrunners Transp.,

Ltd.*, 147 Wn. App. 392, 406, 196 P.3d 711 (2008) (citing *Johnson v. Cash Store*, 116

19

Wn. App. 833, 847-49, 68 P.3d 1099 (2003)).  On review of a decision under CR 60(b),

any findings are reviewed (as in other contexts) for substantial evidence.  *Sutey v. T26*

*Corp.*, 13 Wn. App. 2d 737, 750, 466 P.3d 1096 (2020) (citing *Sunnyside Valley Irrig.*

*Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003)).  We defer to the trial court on

issues of conflicting testimony, witness credibility and the persuasiveness of the

evidence.  *State v. Longuskie*, 59 Wn. App. 838, 844, 801 P.2d 1004 (1990).

The evidence relevant to these challenged findings begins with Jason's declaration

in support of his motion to vacate the judgment, in which he stated:

> [A] complaint was served to me on July 6th, 2020.  I was asked to report to my parole officer, and I was served upon arrival.  I was in custody at the [Spokane] DOC office at the time of service . . . .  As soon as I was served, I was taken by bus to the detention center in Walla Walla with none of my belongings or paperwork.  I had assumed that the paperwork I was served was part of the extensive divorce litigation that I was going through at the time. . . .  I had no way of knowing these papers were served to me at the time given that I was being arrested at the time of service.  I did not have time to read any of the documents before they were taken.
>
> As soon as I arrived at the prison, I was put in the intensive management unit.  This left me isolated for the 45 days that I spent there.  The paperwork that I was served was left with my belongings at the DOC office.  I had no way to know that I needed to respond to this claim.  The claim required that I respond within 20 days; I was still incarcerated at this point in time without my paperwork.  In addition, when I did receive my belongings in a Ziploc back after release, I do not recall this complaint being included in those items.

CP at 78-79.

Michelle responded to Jason's declaration with the declaration of CCO Wilson, who testified he was competent to address the following matters relevant to the trial court's findings:

> 4. On July 6, 2020, Defendant Reid was served with the Summons and Complaint in this matter during a meeting with Officer Whitley. Defendant Reid was offered the opportunity to review the legal documents at this time, but refused. Following service, Defendant Reid was taken back into custody for violating the terms of his release . . . . The Summons and Complaint was stored by the DOC along with Mr. Reid's other personal effects.

> 5. Defendant Reid could have accessed the Summons and Complaint or contact with an attorney at any time while in DOC.

> 6. DOC Policy 590.500 "Legal Access for Incarcerated Individuals" states all incarcerated individuals will be provided meaningful access to the Courts, that individuals in restrictive housing (such as Secure Management Units like Defendant Reid was) will have access to legal documents, materials and resources, incoming and outgoing legal mail will be processed, and that Reid could communicate with counsel and the court, research and prepare legal matters, access materials, purchase and retain legal reference material, obtain free notary services, and have confidential attorney visits. Violators (persons incarcerated for probation/parole-related matters) may have some additional limits, but had Defendant Reid asked, the Counselor would have facilitated access.

> 7. As such . . . while in custody [Reid] was able to contact his DOC counselor for access to and the ability to respond to any legal matters or pleadings . . . . [He] was aware of and familiar with this process having employed it to speak [to] his criminal defense attorney, often in connection with [other matters] . . . .

> . . . .

> 9. . . . [O]n July 8, 2020, just two days after being served, Mr. Reid requested and was given access to legal counsel [in connection with another matter].

21

10. According to DOC records, at no time did Defendant Reid request access to or assistance in responding to the Summons and Complaint served on him in this matter. . . .

11. On August 12, 2020, Defendant Reid was released from DOC custody and provided with all of his personal effects, including a copy of the Summons and Complaint in this matter.

12. On August 17, 2020, Defendant Reid was taken back into DOC custody for violating the terms of his release . . . .

13. According to DOC records and my personal knowledge, Defendant Reid never once exercised his right to access to the Summons and Complaint served on him on July 6, 2020. If he had, he would have promptly been given access to them.

CP at 99-101.

In a reply declaration, Jason provided the following testimony relevant to his

excuse for failing to appear:

It is stated that I was given an opportunity to review the paperwork that I was being served. The circumstances I was subjected to were not reasonable for me to review this paperwork. As soon as I met with my probation officer, I was told I was being put under arrest. I was immediately chained by the waist with my hands at my sides. I was unable to move my arms around at all. I was surrounded by between six to eight police officers at all times. The atmosphere was intense. Officer Wilson repeatedly told me how I was going to be immediately brought to Walla Walla. Conveniently, this was when the process server showed up. I could barely sign with my hands chained to my side. I was unable to review my papers due to my constraints and the pressure from all of the surrounding officers.

. . . .

It was stated that I had access to all of my belongings during my time in Walla Walla. All of my belongings were in Spokane at the corrections office. There would have been no way for me to have access to that paperwork in Walla Walla. In addition, I was in the IMU which is

22

close to isolation. I was completely cut off from all resources. I tried several times to make contact with my counselor, Russell Whitley, through kites but never received a response.

CP at 111.

The trial court's findings that Jason "did not read" and "chose not to read" the summons and complaint because he thought they concerned his divorce are supported by CCO Wilson's testimony that Jason "was offered the opportunity to review the legal documents [when served], but refused" and Jason's own testimony that "I had assumed that the paperwork I was served was part of the extensive divorce litigation that I was going through at the time." CP at 121, 100, 79. While Jason denies having any opportunity to review the documents, the credibility determination reflected in the trial court's findings is unreviewable on appeal. *State v. Kaiser*, 161 Wn. App. 705, 724, 254 P.3d 850 (2011).

The findings that Jason had the opportunity to obtain access to the summons and complaint while in custody notwithstanding that they had not been transported to Walla Walla are supported by CCO Wilson's testimony and DOC policy 590.500. The trial judge who heard the motion to vacate likely had some familiarity with DOC policy 590.500, which is readily accessible to courts. Like this court, the trial court would be familiar with the need of incarcerated prisoners to address impending legal issues and institutional policies that give them a reasonable ability to do so. It would be naïve for a

23

court to assume that DOC *always* complies with prison policies, but the trial court could reasonably look askance at Jason's contention that he had no ability whatsoever to request access to the papers served on him that remained in Spokane. The trial court was entitled to view CCO Wilson's information on this score as more believable.

The findings that the pleadings were returned to Jason on his release from DOC custody on August 12, 2020, which gave him time to review them before entry of the default judgment, is supported by substantial evidence. CCO Wilson's declaration supports the fact that they were returned to Jason on August 12; notably, Jason does not *deny* receiving them at that time, but says only, "I *do not recall* this complaint being included." CP at 79 (emphasis added). It is clear from the record that the default judgment was not entered until August 28, 2020.

Substantial evidence supports the trial court's findings and it did not abuse its discretion in concluding that Jason did not demonstrate the second *White* factor.

III.    THE TRIAL COURT ERRED IN RULING THAT JASON FAILED TO DEMONSTRATE A TIMELY RESPONSE TO ENTRY OF THE DEFAULT JUDGMENT

A motion to vacate a judgment under CR 60(b)(1) must be made within a reasonable time and not more than one year after the judgment is taken. In moving to set aside a default judgment on equitable grounds, timeliness takes on added importance under the third *White* factor. The moving party must be prepared to demonstrate that it "acted with due diligence after notice of entry of the default judgment." 73 Wn.2d at

352. Generally, the passage of several months before moving to vacate the judgment does not qualify as due diligence if no valid justification for the delay is offered. *Luckett v. Boeing Co.*, 98 Wn. App. 307, 313, 989 P.2d 1144 (1999) (four-month delay in motion to vacate was not diligent absent a valid excuse); *see also Ha v. Signal Elec., Inc.*, 182 Wn. App. 436, 454, 332 P.3d 991 (2014) (citations omitted) ("Three months is not within a reasonable time to respond to a default judgment following notice of entry . . . [but] a party that moves to vacate within one month of notice satisfies the diligence requirement.").

Jason's fifth assignment of error contends the trial court erred in finding in paragraph 9 of its findings and conclusions that he was aware of and failed to take timely action to respond to the motion for default. The findings state:

> [O]n October 23, 2020, his former family home was sold pursuant to the parties' divorce decree. Defendant Reid states he was entitled to proceeds of that sale. However, despite being out of DOC custody at the time, Defendant Reid failed to diligently take action after those proceeds were paid to satisfy the judgment lien established by the Default Judgment in this matter. Instead, the Defendant waited seven months before suddenly filing the present motion.

CP at 122, ¶ 9.

Substantial evidence supports the facts that the former family home was sold on the date indicated, Jason believed he was entitled to half the proceeds, and—while Jason did not wait *seven* months to file his motion—there was a *six* month delay. But

25

substantial evidence does not support the finding that Jason was out of custody in October 2020 or the court's inference that the sale of the home gave him notice of the default judgment, triggering his duty to act.

In moving to set aside the judgment, Jason testified, "I didn't find out about this default judgment until about a month ago when my attorney came across it." CP at 79. His declaration is dated March 23, 2021. His motion to vacate the judgment was filed on April 16, 2021. According to this information, the motion was filed within less than two months after Jason learned of the default judgment. In opposing Jason's motion for relief from the judgment, Michelle offered no evidence or argument that Jason would have learned of the default judgment earlier than late February 2021.

At the hearing on the motion to vacate, the trial court queried counsel about whether the sale of the home in October 2020 would have put Jason on notice of the default judgment, since he would have expected half the equity but did not receive it. Jason's lawyer reminded the court that Jason had been rearrested before the house was sold, and had testified in March 2021 that "I have been in jail since October 2nd, 2020." CP at 79. Michelle's lawyer admitted to the court that he "ha[d] no idea what the defendant did or did not know" at the time the house was sold. 2 RP at 31.

There is no substantial evidence to support the trial court's conjecture that Jason learned of the default judgment before late February 2021. It abused its discretion in concluding that he failed to demonstrate *White*'s third, due diligence, factor.

IV.  THE TRIAL COURT DID NOT ERR IN DETERMINING THAT JASON FAILED TO DEMONSTRATE THAT MICHELLE WOULD NOT SUFFER SUBSTANTIAL HARDSHIP

Finally, Jason's sixth assignment of error contends that the trial court erred in finding that vacating the judgment would result in substantial hardship to the plaintiff. Elsewhere in his briefing, he characterizes it as a conclusion rather than a finding, and we agree. He argues that the conclusion should be, but is not, supported by findings; on this, we disagree.

Jason cites no authority that a court is required to enter findings and conclusions in denying a motion to vacate under CR 60(b). This court has previously held that there is no such requirement. *In re Marriage of Hammack*, 114 Wn. App. 805, 811-12, 60 P.3d 663 (2003). Further, CR 52(a)(5)(B) provides that "[f]indings of fact and conclusions of law are not necessary . . . [o]n decisions of motions under rules 12 or 56 or any other motion, except as provided in rules 41(b)(3) and 55(b)(2)."

Absent an explanation of the trial court's conclusion on the substantial hardship factor, we assume the trial court was persuaded by Michelle's argument as to how she would be harmed. Michelle argued she would be harmed because she relied on the finality of her default judgment to execute on the equity realized on the sale of the family

home, and she used those funds to close her business, move far away from Spokane, and take up life and work elsewhere. She argued she was financially unable to replace funds she had already spent. Jason offered no countervailing evidence that Michelle had other sufficient resources. He did not propose to eliminate this hardship by conceding liability in at least the amount she had spent and would not be able to restore.

Financial dependency on a judgment was implicitly recognized as supporting a finding of substantial hardship in *Gutz v. Johnson*, 128 Wn. App. 901, 920, 117 P.3d 390 (2005), *aff'd sub nom. Morin v. Burris*, 160 Wn.2d 745, 161 P.3d 956 (2007), even though the facts did not support the argument in that case. The defaulting party was held to have demonstrated "no substantial hardship" where Ms. Gutz "has always been employed and is not dependent on the judgment for her livelihood" and the Gutzes "do not appear to be receiving ongoing medical treatment." *White*, 73 Wn.2d at 352; *Gutz*, 128 Wn. App. at 921.

Jason fails to show that vacating Michelle's judgment would not cause her to suffer this substantial hardship. The trial court did not abuse its discretion in concluding that Jason failed to demonstrate the fourth *White* factor.

V.  THE TRIAL COURT DID NOT ERR IN REFUSING TO VACATE THE DEFAULT JUDGMENT, AND JASON IS NOT ENTITLED TO AN AWARD OF ATTORNEY FEES

Jason's first assignment of error is to the trial court's entry of the order denying his motion to vacate. Denial was proper, however, even where we disagree with the trial

court's conclusion that Jason failed to demonstrate due diligence. He failed to demonstrate the other *White* factors, including the primary first and second factors.

Jason requests an award of attorney fees and costs, relying on RAP 18.1(a) and RCW 26.09.140. RAP 18.1 permits a party to request an award of reasonable attorney fees on appeal if a party is entitled to them under applicable law. RCW 26.09.140 authorizes the court to order a party to pay costs, including attorney fees, incurred in a proceeding under chapter 26.09 RCW, which governs dissolution proceedings. Jason fails to explain how Michelle's tort action qualifies as a dissolution proceeding under chapter 26.09 RCW. His request is denied.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_Siddoway, C.J._
Siddoway, C.J.

WE CONCUR:

_Fearing, J._
Fearing, J.

_Lawrence-Berrey, J._
Lawrence-Berrey, J.